RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

RICHARD WESLEY,

               *Plaintiff-Appellant,*

    *v.*

ALISON CAMPBELL, et al.,

               *Defendants,*

JOANNE RIGNEY, individually and in her capacity as
a police officer for the City of Covington,

               *Defendant-Appellee.*

No. 13-5960

> Appeal from the United States District Court
> for the Eastern District of Kentucky at Covington.
> No. 2:10-cv-00051—David L. Bunning, District Judge.
>
> Argued: March 12, 2014
>
> Decided and Filed: March 2, 2015
>
> Before: DAUGHTREY, CLAY, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Paul J. Hill, Fort Mitchell, Kentucky, for Appellant. Bryce C. Rhoades, CITY OF COVINGTON, Covington, Kentucky, for Appellee. **ON BRIEF:** Paul J. Hill, Fort Mitchell, Kentucky, for Appellant. Bryce C. Rhoades, Frank E. Warnock, CITY OF COVINGTON, Covington, Kentucky, for Appellee.

1

_____

**OPINION**

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge.   In this civil rights case, plaintiff Richard Wesley, formerly an elementary school counselor and child behavioral specialist, appeals two adverse decisions by the district court in the lawsuit he brought against Joanne Rigney, an officer with the Covington Police Department, for false and retaliatory arrest.   After finding probable cause, the district court initially dismissed Wesley's false arrest claim for failure to state a claim upon which relief could be granted and, subsequently, granted summary judgment to Rigney on Wesley's related claim for retaliatory arrest.   Both claims arose from the same incident, in which one of Wesley's then-students accused Wesley of sexually assaulting him and two other students in an office at the school's administrative center.   Rigney waited almost three months after the student made his allegations before seeking a warrant for Wesley's arrest and then omitted from her application a range of material facts demonstrating the unreliability of the student and his allegations.   Taken together, those omissions thoroughly undermined the existence of probable cause.   Because the district court's improper finding of probable cause supported its decisions to dismiss the complaint, we reverse the district court's judgment and remand the case for trial.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The sexual-abuse allegations leveled against Richard Wesley were made by a seven-year-old male student referred to in this opinion as "J.S."   At the time, Wesley served as a counselor and intervention specialist at Sixth District Elementary School in Covington, Kentucky, where he provided a range of services to students who, like J.S., suffered from psychological and behavioral problems.   On February 5, 2009, Wesley responded to reports of a disturbance in a school hallway and found J.S. in the midst of an attempt at self-harm.   Wesley removed J.S. from the hallway and brought the boy into his office, located in the middle of the school's administrative center, where he had been counseling two other students when the disturbance began.   While Wesley left to contact J.S.'s mother, school secretary Peri Fischer stayed with the

three students.  She later testified that J.S. and Wesley were never alone together in Wesley's office that day.

Wesley reached J.S.'s mother by phone, informed her of the incident, and recommended that she take J.S. to NorthKey Community Care, a local mental health center.  Before J.S.'s mother arrived, Wesley told J.S., "[W]hatever you do, make sure you tell them everything that is bothering you at the hospital, whether it's anything that's bothering you at school, whether anything is bothering you at home, make sure you let them know."  When J.S.'s mother arrived at the school, Wesley called a cab for her and J.S., and followed them to NorthKey in his own car to make sure that they arrived.  Wesley had an extensive record of counseling with J.S., knew that the boy had previously been hospitalized in a local psychiatric unit, had tried to arrange for J.S. to be evaluated at NorthKey, and knew that the boy's mother had failed to appear for his appointments there.

Before entering NorthKey, J.S.'s mother angrily confronted Wesley in the parking lot, shouting, "I know what you said to him, I know what you told him," and demanded that Wesley leave NorthKey.  According to J.S.'s mother, J.S. disclosed during the car ride that Wesley had sexually abused him.  She repeated those allegations to NorthKey personnel after Wesley left the center and returned to Sixth District School.  NorthKey contacted the Kentucky Cabinet for Health and Family Services and arranged for Alison Campbell, a social worker with the Cabinet's Child Protection Branch, to meet J.S. and his mother that same day.  In her investigative notes from her first interview with J.S., Campbell recorded J.S.'s allegations:

> [J.S.] reported that earlier that day he was in Mr. Wesley's office due to being in trouble at school.  When [J.S.] first arrived there were two other children in the room but a little while later they all left and he was alone with Mr. Wesley.  Mr. Wesley closed the door (he indicated it was not shut all the way but was open a small crack) and stood next to [J.S.] by the round table in his office.  Mr. Wesley then touched [J.S.]'s "private part" with his left hand.  [J.S.] reported the touch was on top of the clothes.  He further reported that he and Mr. Wesley both had their clothes on.  He denied Mr. Wesley said anything at that time but before [J.S.] left Mr. Wesley grabbed [J.S.] on the shoulder and told him not to tell anyone.

As a result of this complaint, Campbell contacted Joanne Rigney, a detective in the Covington Police Department with whom she had worked on similar cases, and with whom she

had become friends. Notably, Rigney's participation in the ensuing investigation came at Campbell's instigation, rather than through normal assignment channels in the police department. Both Campbell and Rigney were present at a forensic interview of J.S. that took place six days later at the Children's Advocacy Center (CAC), a non-profit organization providing services to abused children. At this interview, J.S. described sexual abuse far more serious than that which he had disclosed in his earlier meeting with Campbell. He alleged that following the self-harm incident on February 5, Wesley had brought J.S. into his office and, with the door cracked open, sodomized him by "put[ting] his private part in [J.S.'s] butt." He stated that during this assault, Wesley was nude but that J.S.'s pants were on—pressed by the interviewer, J.S. clarified that Wesley had pulled down his "soft pants" in the back. Asked "how were you when [Wesley] did [the sodomy]," J.S. responded that both he and Wesley were "[s]tanding straight up." During the abuse, J.S. recalled looking out the office's ground-floor window and seeing his "Mom and Dad, and . . . sister" just outside the window. J.S. stated that having Wesley's "private part in [his] butt" made him feel "sad." It "didn't feel good," he elaborated, because "it [felt] like I was being treated wrong." J.S. also recalled certain details about Wesley's office, such as the presence of a window and a blue table. More ominously, he stated that Wesley had been sexually assaulting him in this manner for over a year and that Wesley had been sexually abusing two other children at the school as well.

As part of their joint investigation, Campbell and Rigney visited Sixth District Elementary the same day. Their goal was to have J.S. identify the two boys in Wesley's office during the February 5 incident, as well as the two other abuse victims he had mentioned during the CAC interview. J.S., however, was out sick. Because J.S. was unavailable to make identifications, Campbell and Rigney sought to locate the other abuse victims by using school records to identify "any child that [Wesley] had access to" on more than one occasion over the previous year. Those records indicated that 35 students had met previously with Wesley, a figure Rigney and Campbell considered to be the pool of children Wesley would have been able to abuse. They also spoke with Principal Anthony Ross, who allowed Rigney and Campbell to search Wesley's office, where they found school scheduling records confirming that he and J.S. had met together regularly. Consistent with J.S.'s description, they also found that Wesley's office contained a window and a blue table.

Rigney and Campbell did not seek to verify J.S.'s allegations by questioning potential witnesses at the school. For example, when Rigney spoke to Principal Ross, she did not ask if he had witnessed the incident on February 5. Nor did she speak with the school secretary, Peri Fischer, even though her desk directly faced Wesley's office. Later, in deposition testimony, Rigney agreed that she "didn't ask anyone at the school anything about the allegations that J.S. made," because she did not feel that their answers were "important to that specific part of the investigation." This omission proved an unfortunate one for Wesley, because Fischer, a genuine eyewitness, would later confirm in an affidavit that no inappropriate behavior occurred.

The next day, February 12, Campbell returned to the school with six other social workers. Working in shifts, they removed from class each of the 35 children identified as having met with Wesley more than once and interviewed them, individually, regarding sexual abuse, "bad touching," and their relationships with Wesley. The children uniformly denied any inappropriate or unprofessional behavior on Wesley's part.

Rigney also arranged for J.S. to undergo a medical examination for signs of physical trauma from the alleged anal rapes. He was examined by Dr. Philip Lichtenstein on February 18 at the CAC. On April 15, the "medical exam came back with no concerns." After scheduling this examination, Rigney and Campbell took no further steps to investigate J.S.'s allegations.

When he returned to Sixth District School after his initial confrontation with J.S.'s mother, Wesley was placed on indefinite administrative leave and was later formally terminated. During this time, Wesley made efforts to set up an interview with Rigney regarding the allegations, but for reasons the parties dispute, no interview ever occurred. Nor was he interviewed by Campbell, who nevertheless decided that J.S.'s allegations had been substantiated. Accordingly, she prepared a formal "substantiated investigation notification letter," which she sent to the Cabinet, the state teacher licensing board, Sixth District Elementary School, and Wesley. The letter was dated March 19, 2009, and read as follows:

> The factual basis for the substantiated finding of abuse or neglect . . . is as follows: On February, 5, 2009 [J.S.] disclosed to the Cabinet that Mr. Wesley fondled his penis. On February 11, 2009 at the Children's Advocacy Center [J.S.] further disclosed that on multiple occasions, occurring over a one year period that Mr. Wesley anally sodomized him.

The letter further explained that Wesley had an opportunity to appeal the finding administratively; if he chose to forgo the appeal, then his name would be placed on a state-wide sex offender registry, making him ineligible to work as a teacher or adopt children. Through counsel, Wesley filed an appeal on March 31, 2009. Rigney learned of Wesley's appeal sometime in early- to mid-April.

On April 27, 84 days after the initial abuse allegations and ten days after learning of the negative medical examination, Rigney sought a warrant for Wesley's arrest. In support, she prepared an affidavit attesting to the following facts:

> Affiant states that on February 06, 2009, she was assigned to investigate a Sexual Abuse in the First Degree report. Affiant states that she was contacted by the Cabinet for Health and Family Services in regard to a disclosure that was made by the minor victim J.S., age 7, on February 05, 2009. At that time, J.S. stated that the defendant had fondled his penis while in the defendants [sic] office at 6th District School. The defendant is employed as a school counselor at 6th District School. The minor, J.S., was then scheduled for a forensic interview at the Children's Advocacy Center, at that time the child stated that the defendant had put his private part in his butt. J.S. stated that this took place in Mr. Wesley's office. J.S. described that the defendant pulled down the back of his pants while he was near a blue round table. J.S. also advised that the defendant was squeezing J.S.'s private part. J.S. stated that he was told by the defendant that he would kick him out of school if he told anyone. J.S. stated that this happened more than once.

A state magistrate reviewed the affidavit and concluded that there was probable cause to arrest Wesley. Sheriff's deputies then arrested Wesley at his home, and he remained in jail until he was able to post bond.

The case against Wesley fell apart soon afterwards. J.S. and his mother refused to cooperate with the prosecution's investigation, and the state's attorney concluded that the case could not be tried. At her request, a grand jury declined to indict Wesley, and the charges were dismissed. Nearly a year later, on February 15, 2010, an administrative hearing officer summarily reversed Campbell's finding of substantiated abuse.

Wesley then brought the present civil rights lawsuit against Rigney and others, including Campbell.[1] His claims against Rigney included unlawful arrest, outrage, and negligent investigation. The parties conducted full discovery, after which Wesley amended his complaint to add a claim for retaliatory arrest, based on the theory that the arrest by Rigney was in retaliation for his decision to appeal Campbell's finding of substantiated abuse.

Although she had not filed a motion to dismiss during the litigation's initial phase, and although discovery was by this point complete, Rigney moved to dismiss the amended complaint pursuant to Rule 12(b)(6). The district court granted the motion with regard to the false arrest, outrage, and negligent investigation claims, finding that probable cause supported the arrest and that Rigney was qualifiedly immune in any event. *Wesley v. Rigney*, 913 F. Supp. 2d 313, 321 (E.D. Ky. 2012). Rigney had not sought qualified immunity on the retaliatory-arrest claim, and the district court allowed that claim to proceed. Soon after, Rigney moved for summary judgment on the retaliatory arrest claim, this time asserting qualified immunity. In an unpublished opinion, the district court granted the motion, again finding that the arrest was supported by probable cause. *Wesley v. Rigney*, CIV.A. 10-51-DLB-JGW, 2013 WL 3107503 (E.D. Ky. June 18, 2013). Wesley now appeals both orders.

## II. DISCUSSION

Both decisions by the district court turn on essentially the same legal question: whether J.S.'s uncorroborated allegations created probable cause for Wesley's arrest. If the arrest was supported by probable cause, then Rigney would be entitled to qualified immunity. If not, then qualified immunity was inappropriate and both decisions must be reversed. Although this common question is of considerable importance, the district court's two decisions occurred in different procedural postures, and we therefore address them separately.

## A. <u>Rule 12 dismissal of wrongful arrest claim</u>

The district court dismissed Wesley's false-arrest claim under Rule 12(b)(6). To survive dismissal on that basis, the plaintiff must "allege[] facts that 'state a claim to relief that is

---

[1]The district court dismissed the claims against defendants other than Rigney. *Wesley v. Campbell*, CIV.A. 10-51-DLB, 2010 WL 3120204 (E.D. Ky. Aug. 5, 2010). Wesley does not appeal that decision.

plausible on its face' and that, if accepted as true, are sufficient to 'raise a right to relief above the speculative level.'" *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Plaintiffs need not meet a "probability requirement," although they must show "more than a sheer possibility that a defendant has acted unlawfully." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In ruling on the issue, a district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). "The defendant has the burden of showing that the plaintiff has failed to state a claim for relief," *id.* (citing *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991)), and dismissal on this basis is reviewed *de novo*. *Golden v. City of Columbus*, 404 F.3d 950, 958 (6th Cir. 2005).

Before proceeding to the merits of the motion to dismiss, we note a critical threshold error in the district court's opinion. Instead of the "plausibility" standard our precedent clearly requires, the district court improperly held Wesley to a novel and significantly higher standard. The district court determined—indeed, emphasized—that Wesley was required to make "a *substantial* showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth" in order to survive Rule 12 dismissal. *Wesley*, 913 F. Supp. 2d at 322 (emphasis in original). Such a "substantial" pleading burden at the Rule 12 stage is plainly inappropriate in light of *Iqbal* and *Twombly*—cases that the district court cited but failed to apply—as well as this circuit's settled precedent.

The district court's error apparently stems from its reliance on *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003), a case that does speak of the "substantial showing" plaintiffs must make when faced with dismissal. *Vakilian*, however, is a summary judgment case, as is every other case cited by the district court in support of its "substantial showing" standard. *See Peet v. City of Detroit*, 502 F.3d 557, 570 (6th Cir. 2007) (Holschuh, J., concurring in part and dissenting in part) (citing *Vakilian* at summary judgment phase); *Ahlers v. Schebil*, 188 F.3d 365 (6th Cir. 1999) (reviewing grant of summary judgment); *Butts v. City of Bowling Green*, 374 F. Supp. 2d 532 (W.D. Ky. 2005) (deciding motion for summary judgment); *Scott v. Kelley*, 2012

WL 479896 (E.D. Ky. Feb. 14, 2012) (same). Other than the district court's own decision, no published opinion within the Sixth Circuit has ever imported *Vakilian*'s "substantial showing" language into the Rule 12 context.

At oral argument before this court, Rigney conceded that *Vakilian*'s "substantial showing" standard was inappropriate at the Rule 12(b)(6) stage. We agree. Moreover, review of the pleadings and applicable case law leaves us convinced that Wesley has satisfied his initial pleading burden.

The district court dismissed Wesley's false arrest claim on qualified-immunity grounds. To review that decision, we apply this circuit's "two-tiered inquiry." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)). "The first step is to determine [whether] the facts alleged make out a violation of a constitutional right." *Id.* In this case, the right involves freedom from arrest in the absence of probable cause. If the plaintiff has shown a violation of a constitutional right, then "[t]he second [step] is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* We have held that in the context of an officer's application for an arrest warrant from a neutral magistrate, the officer violates clearly established law when he makes material omissions that are "deliberate . . . or show[ ] reckless disregard for the truth." *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006); *accord Vakilian*, 335 F.3d at 517. Both inquiries must be resolved in Wesley's favor for the claim to proceed. *See Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012) (citing *Saucier v. Katz*, 455 U.S. 194, 201 (2001)).

To show in response to a motion to dismiss that the arrest was wrongful, Wesley must plausibly allege that it was unsupported by probable cause. *See Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003). An officer possesses probable cause when, at the moment the officer seeks the arrest, "the facts and circumstances within [the officer's] knowledge and of which [she] had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). A probable cause determination is based on the "totality of the

circumstances," and must take account of "both the inculpatory *and* exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis in original); *accord Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999). Although precedent "does not mandate that law enforcement operatives should conduct quasi-trials as a necessary predicate to" arrest, *Painter v. Robertson*, 185 F.3d 557, 571 n.21 (6th Cir. 1999), an officer "cannot simply turn a blind eye" toward evidence favorable to the accused, *Ahlers*, 188 F.3d at 372, or "ignore information which becomes available in the course of routine investigations." *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002).

Treating J.S.'s allegations as statements based on first-hand observation does not resolve the dilemma here. Some of our cases adopt the rule that "[a]n eyewitness identification will constitute sufficient probable cause" because eyewitness observations are "generally entitled to a presumption of reliability and veracity." *Ahlers*, 188 F.3d at 370; *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006). However, other cases take the position that an eyewitness's "mere allegation" may create reasonable suspicion justifying an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), but falls short of creating probable cause absent some corroborating evidence of wrongdoing. *See Gardenhire*, 205 F.3d at 317 ("Consider the following situation: a woman flags down a police officer and points out a Porsche being driven by a young man, which the woman claims is her car and which has been stolen by the man. Would the officer have probable cause to arrest the Porsche's driver at that point? We think not."); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005) ("[A] mere allegation [of criminal behavior], while possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause that a crime had been committed.").

Although there is some tension between these cases, we need not resolve it here because, even under the *Ahlers* line of cases, J.S.'s uncorroborated allegations were legally insufficient to create probable cause. While adopting a presumption of reliability for eyewitness allegations, those cases also contain an important limiting factor: Probable cause is created only by eyewitness allegations that are "*reasonably trustworthy*," *Logsdon v. Hains*, 492 F.3d 334, 342 (6th Cir. 2007) (quoting *Beck*, 379 U.S. at 91) (emphasis added), and thus probable cause does *not* exist where "there is an apparent reason for the officer to believe that the eyewitness was

lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection." *Ahlers*, 188 F.3d at 370 (internal quotation marks omitted). Put another way, the presumption of veracity applies only where the witness is "someone with respect to whom there is *no* apparent reason to question the person's reliability." *Logsdon*, 492 F.3d at 343 (emphasis added).

Here, as the district court noted, probable cause for Wesley's arrest was "based solely on [J.S.]'s statements." *Wesley*, 913 F.Supp.2d at 321. Hence, Wesley's complaint stated a claim for false arrest under Rule 12(b)(6) as long as he alleged facts allowing the fact-finder to infer some "apparent reason to question [J.S.]'s reliability." *Logsdon*, 492 F.3d at 343.

Wesley's complaint meets that burden. It contains the following factual allegations bearing on J.S.'s reliability as a witness: (1) J.S. was a young child; (2) Wesley's office (where the alleged abuse occurred) was located at the center of the school's "administrative hub," within the line of sight of other adult staff members; (3) J.S.'s allegations about the abuse were inconsistent; (4) J.S. suffered from a history of serious psychological and emotional disturbances; (5) Rigney required J.S. to undergo a medical examination and that examination showed no evidence consistent with his allegations of sexual abuse; and (6) Rigney's investigation failed to uncover any evidence corroborating any aspect of the abuse J.S. alleged. Taken together, the "totality of the[se] circumstances," *Gardenhire*, 205 F.3d at 318, raises doubts about J.S.'s reliability that are clearly "above the speculative level," *Twombly*, 550 U.S. at 555. We discuss these factual allegations in turn.

First, like other circuits, we have expressed serious concern about basing probable cause solely on the uncorroborated allegations of a child. *See, e.g., United States v. Shaw*, 464 F.3d 615, 624 (6th Cir. 2006); *Stoot v. City of Everett*, 582 F.3d 910, 919–20 (9th Cir. 2009); *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007). In *Shaw*, we held that a young child's uncorroborated hearsay allegations were too unreliable to form the basis for probable cause. 464 F.3d at 624. Although *Shaw* involved hearsay allegations (rather than direct allegations, as is the case here), its underlying reliability rationale remains relevant. *See* Diana Younts, *Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions*, 41 Duke L.J. 691, 697 (1991) ("[S]tudies examining children's suggestibility have found

children to be prone to conforming their stories to the beliefs of the questioning adult."), *quoted in United States v. LeBlanc*, 45 F. App'x 393, 399 n.1 (6th Cir. 2002). In *Stoot*, the Ninth Circuit correctly read *Shaw* to reflect concerns about *all* uncorroborated allegations by children, not just those involving hearsay. 582 F.3d at 922.

Indeed, it appears that no federal court of appeals has ever found probable cause based on a child's allegations absent some other evidence to corroborate the child's story. The district court cited two cases for a contrary rule, *Lowe v. Aldridge*, 958 F.2d 1565 (11th Cir. 1992), and *Gerald M. v. Conneely*, 858 F.2d 378 (7th Cir. 1988), but in both of those cases, the children's allegations actually enjoyed substantial independent corroboration.[2] In *Shaw*, we conducted a survey of cases basing probable cause in part on children's allegations and likewise found, in each instance, "independent evidence corroborating the children's statements."[3] 464 F.3d at 624−26. Moreover, our independent research has not uncovered a contrary result from another circuit. Indeed, some cases have expressed *heightened* concerns about the reliability of child-witnesses' allegations when, as here, there are other indicia of unreliability. *See, e.g.*, *Shaw*, 464 F.3d at 624 (holding that child's young age, combined with hearsay nature of statement, made statement insufficient to create probable cause); *Stoot*, 582 F.3d at 919−20 (holding that child's age, when combined with inconsistent statements and confused identifications, rendered allegations too unreliable to create probable cause). We are, of course, all too aware of the difficulties facing police investigations into child sexual abuse. We recognize that a child-victim's testimony often plays an important role in prosecuting the perpetrators of this serious and disturbing crime. Nevertheless, we conclude that J.S.'s young age is a factor bearing on the reliability of his accusations and that Rigney (and the district court) should have given it appropriate weight.

---

[2]In *Lowe*, the child's accusations were corroborated with medical evidence showing vaginal injury "consistent with her account of abuse," as well as nearly-identical abuse allegations from two other children. 958 F.2d at 1568. In *Gerald M.*, the officer's decision to arrest two minor suspects was supported by both the minors' admitted involvement in the wrongdoing and their ability to lead the officer to the location of the property they had stolen and abandoned. 858 F.2d at 380. Public safety concerns also supported the arrest in *Gerald M.*, because an angry crowd had formed outside the minors' home and the officer was "afraid for the children's safety." *Id.*

[3]The *Shaw* court examined *Rankin v. Evans*, 133 F.3d 1425, 1440–41 (11th Cir. 1998); *Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990); *Myers v. Morris*, 810 F.2d 1437, 1456 (8th Cir. 1987); and *Easton v. City of Boulder*, 776 F.2d 1441, 1450 (10th Cir. 1985). In each of those cases, the *Shaw* court found other significant evidence corroborating the child's allegations. 464 F.3d at 624.

Second, we note that the implausibility of a witness's accusations is also germane to determining the existence of probable cause. *Gardenhire*, 205 F.3d at 315. When a witness's allegations are unlikely, it suggests that he or she may be "in some fashion mistaken regarding his recollection." *Ahlers*, 188 F.3d at 370 (internal quotation marks omitted); *see Peet*, 502 F.3d at 573 (Holschuh, D.J., concurring in part and dissenting in part) ("[T]he unlikely conduct of a defendant is a factor to consider in the determination of whether a police officer had probable cause.").

Without question, J.S.'s allegations against Wesley were facially implausible. According to Wesley's complaint, "J.S. claimed . . . that on multiple occasions over a one year period, Plaintiff had anally sodomized him while they were in Plaintiff's office." Wesley alleged that this office was in an extremely well-traveled hallway at the center of the school's "administrative hub," located between the faculty mailroom and the principal's office and directly facing the school secretary's desk. Wesley has alleged that Rigney was aware (or should have been aware) that Wesley's office door was open whenever he met with a student and that multiple school staff members had a direct line of sight into Wesley's office. Taken as true, these facts show that it would have been difficult for the severe sexual abuse J.S. described to continue for so long undetected.[4]

The complaint also alleges that J.S. struggled unsuccessfully to tell a consistent story with regard to the details, severity, and duration of the sexual abuse he endured. Specifically, in the first telling, J.S. accused Wesley of a single act of over-the-clothes touching. Six days later, this story had escalated to repeated anal sodomy, occurring multiple times over the course of a year.

A "child's inconsistent identifications cast doubt on her reliability." *Ollis*, 810 F.2d 202. As the Ninth Circuit concluded in *Stoot*, a child's allegations of sexual abuse failed to establish

---

[4]The district court agreed that Wesley's allegations "show that it would be more difficult to commit the alleged sexual abuse." 913 F. Supp. 2d at 323. It did not consider this fact relevant to probable cause, however, because Wesley did not show "that it would have been *entirely impossible* for the alleged abuse to have occurred." *Id.* (emphasis added). This explanation plainly misstated Wesley's burden. He did not need to prove that J.S.'s allegations were "entirely impossible," but only to make a plausible showing that they were "in *some way* untruthful or unreliable." *Ahlers*, 188 F.3d at 371 (emphasis added). Even if J.S.'s story was not objectively impossible as such, a proper probable cause analysis would be required to take its implausibility into account as a factor tending —in this case, strongly tending—to undermine reliability.

probable cause when she "changed her answers at several points during the interview." 582 F.3d at 920. Conversely, the witness's credibility in *Ahlers* was bolstered by the fact that she made consistent statements about the alleged sexual assault each of the three times she was interviewed by officers. 188 F.3d at 371. Although it is true that an eyewitness's allegations need not be perfectly consistent in order to establish probable cause, *see, e.g.*, *United States v. Trujillo*, 376 F.3d 593, 604 (6th Cir. 2004), we conclude that J.S.'s inconsistent stories should have suggested to Rigney that he was unreliable.

Similarly, J.S.'s history of psychological problems supported an inference that he was a less reliable witness than a psychologically healthy child. Wesley has alleged that, at the time Rigney sought his arrest, she was aware of J.S.'s "severe mental and emotional problems"—problems that included violent fantasies and suicidal impulses and that had previously led to his psychiatric hospitalization for at least two weeks. Clearly, "mental illness can indeed be relevant to a witness's credibility." *Boggs v. Collins*, 226 F.3d 728, 742 (6th Cir. 2000). Mental illness also bears more heavily on credibility when, as in J.S.'s case, "the witness suffered from the condition at the time of the events" he described. *Id.*

Furthermore, the results of J.S.'s medical examination, which showed no evidence of anal sodomy or other abuse-related injury, also undermine *Ahlers*'s presumption of veracity. "Such 'negative' or 'inconclusive' results . . . may be exculpatory even where they do not provide definitive evidence on a particular issue," because they "'demonstrate that a number of factors which could link the defendant to the crime do not.'" *Simmons v. Beard*, 590 F.3d 223, 237 (3d Cir. 2009) (quoting *Patler v. Slayton*, 503 F.2d 472, 479 (4th Cir. 1974)).

It follows that the district court was too quick to dismiss the negative medical exam, based on a rationale that the results of the exam had no bearing on probable cause because "a victim of sexual abuse often presents no injuries upon physical examination." *Wesley*, 913 F. Supp. 2d at 326 (citing John E.B. Myers, *Expert Testimony in Child Sexual Abuse Litigation: Consensus and Confusion*, 14 U.C. Davis J. Juv. L. & Pol'y 1, 20 (2010)). The journal article cited by the district court also notes that anal penetration "may or may not cause injury," and that "[c]ontroversy exists" regarding the extent of injuries it is likely to cause. *Id.* at 20 n.70. Other studies suggest comparatively higher rates of physical injury; one indicates that

among child victims of anal penetration, 64 percent of girls and 34 percent of boys will show "positive findings suggestive of ano-genital injury." Risa N. Claytor et al., *Evaluating Child Sexual Abuse: Observations Regarding Ano-genital Injury*, 28 Clinical Pediatrics 419 (1989). To the extent that doubts exist regarding whether the medical examination is probative, those questions must be resolved in Wesley's favor and the district court erred in refusing to do so.

Finally, Rigney's inability to uncover any evidence corroborating J.S.'s story (despite her efforts to do so) further undermines the allegation's presumed reliability. "In cases involving very young child victims, the courts have repeatedly emphasized the need for some evidence in addition to the statements of the victim to corroborate the allegations and establish probable cause." *Stoot*, 582 F.3d at 920 (citing *Shaw*, 464 F.3d at 624). In *Shaw*, for example, we declined to find probable cause where the police failed to "ma[k]e any effort whatsoever to corroborate the [witness's hearsay] allegations before taking [the defendant] into custody." *Shaw*, 464 F.3d at 625. In this case, Rigney did make an effort to investigate J.S.'s story, but found "no information from [the people she interviewed] other than [that] Plaintiff had always acted professionally and appropriately."

For the reasons explained above, we conclude that Wesley plausibly alleged that Rigney effected his arrest without probable cause. Taken as true, Wesley's allegations also plausibly show that Rigney is not entitled to qualified immunity, because her application for an arrest warrant contained omissions that were "deliberate . . . or showed reckless disregard for the truth" and were "material to the finding of probable cause." *Gregory*, 444 F.3d at 758; *accord Vakilian*, 335 F.3d at 517.

As a threshold matter, it seems clear that Rigney's decision to withhold evidence of J.S.'s unreliability was material, because it is clearly established that witness allegations fail to sustain probable cause when there is "apparent reason to question the person's reliability." *Logsdon*, 492 F.3d at 343. If the magistrate who issued the arrest warrant had known that there were, in fact, several "apparent reason[s] to question" J.S.'s reliability, precedent would have precluded a finding of probable cause, and the warrant would not have issued.

In addition, Rigney's omissions demonstrate "deliberate[ness]" or a "reckless disregard for the truth," given that any reasonable officer would have recognized the importance of J.S.'s

reliability on the question of probable cause. Put another way, any reasonable officer would have known that the gaps in J.S.'s credibility would be "the kind of thing the judge would wish to know." *See Peet*, 502 F.3d at 570 n.3 (Holschuh, J., concurring in part and dissenting in part) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)). Hence, qualified immunity was inappropriate, because it is clearly established that "[p]olice officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court." *Gregory*, 444 F.3d at 758 (citing *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1243 (6th Cir. 1989)).

Moreover, it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point," *Vakilian*, 335 F.3d at 516 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982)), that point is usually summary judgment and not dismissal under Rule 12. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Village Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring) (observing that the fact-intensive nature of the applicable tests make it "difficult for a defendant to claim qualified immunity on the pleadings *before discovery*" (emphasis in original)); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."); *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001) ("[Q]ualified immunity is typically addressed at the summary judgment stage of the case."); *Grose v. Caruso*, 284 F. App'x 279, 283 (6th Cir. 2008) ("[T]he standard for a 12(b)(6) motion is whether the allegations, if taken as true, could state a claim upon which relief may be granted, [and] dismissal of Appellants on the basis of qualified immunity is premature."). Unsurprisingly, each of the qualified-immunity cases cited by the district court involved summary judgment and not Rule 12(b)(6) dismissal. Additionally, to the extent that the "burdens of discovery" ever weigh in favor of deciding qualified immunity at the motion-to-dismiss stage, *see Iqbal*, 556 U.S. at 672, that concern was irrelevant here because discovery was complete when Rigney moved for dismissal under Rule 12(b)(6). *Wesley*, 913 F. Supp. 2d at 319–20.

Nor do we find persuasive Rigney's arguments to the contrary.  Chiefly, she argues that J.S.'s initial allegations created probable cause as a matter of law and that, as a result, she was immune from liability regardless of whether she conducted an adequate investigation (or, indeed, any investigation) prior to seeking a warrant for Wesley's arrest.  Although it is true that "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused," *Ahlers*, 188 F.3d at 371, that rule assumes the existence of probable cause and, as we have explained above, in this case probable cause was never established.  We conclude that Wesley successfully pleaded a violation of his clearly established Fourth Amendment right against wrongful arrest and that the strength of Wesley's complaint also requires rejection of Rigney's claim to qualified immunity.

## B. **Summary judgment on Wesley's retaliatory arrest claim**

Wesley also appeals the district court's order granting summary judgment to Rigney on his retaliatory-arrest claim.  The legal basis for this decision is essentially the same as the Rule 12(b)(6) dismissal discussed above:  The district court concluded that Rigney possessed probable cause for the arrest and thus granted her motion for qualified immunity.  Unlike its Rule 12 decision, however, this decision by the district court took into account the parties' extensive discovery.  Accordingly, we review that decision in light of Rule 56's legal standard and in consideration of the evidence produced through discovery.

Summary judgment is appropriate "if the pleadings, the discovery and the disclosure materials on file, and any affidavits 'show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)) (alteration omitted).  There is "no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Id.* (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In deciding the motion, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party."  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

A claim for retaliatory arrest requires, at a minimum, that the plaintiff make three related showings:  "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken

against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 217 (6th Cir. 2011) (quoting *Thaddeus-X v. Blatter*, 175 F.3d. 378, 394 (6th Cir. 1999) (*en banc*)).  Although we have not resolved "whether lack of probable cause is an element in wrongful-arrest claims" in this circuit, *id.* at 217 n.4, the existence of probable cause is clearly relevant to an officer's qualified immunity on a claim for retaliatory arrest.  *See Reichle v. Howards*, 132 S. Ct. 2088, 2093–94 (2012).  On the basis of its finding that probable cause existed, then, the district court granted Rigney's request for qualified immunity without considering the other elements of a retaliatory arrest.

In our view, the record not only substantiates the claims contained in Wesley's complaint but also provides further factual grounds that undermine the reliability of J.S.'s allegations, principally in the form of contradictory witness statements and evidence at odds with those statements, all of which were known—or should have been known—to Rigney in advance of her application for an arrest warrant.   It is well-settled that evidence contradicting even part of a witness's allegations seriously undermines their reliability and can defeat probable cause.  *See, e.g., Radvansky*, 395 F.3d at 304, 307 (holding that no probable cause existed where "undisputed documentary evidence" contradicted eyewitness's accusations); *Logsdon*, 492 F.3d at 338–39, 342–43 (ruling that no probable cause arose when part of an eyewitness's accusation of trespass against a protestor was contradicted by other sources); *see also Baptiste v. J.C. Penney, Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998) (holding that an eyewitness's allegation of shoplifting failed to create probable cause because video evidence available to arresting officer contradicted allegations).  Even if only part of the witness's allegation is demonstrably false, the report as a whole will still lose its presumption of reliability.  *See Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir. 2005) (noting that if the witness's factual allegations were proven incorrect in one regard, "[t]his alone would have caused a reasonable officer to question the veracity of the [witness's] report").

In this case, the most significant evidence to fall into this category resulted from Rigney's interviews with Wesley's former students at Sixth District School.  J.S. alleged that Wesley was

sexually abusing two other children at Sixth District Elementary, but Rigney's investigative efforts to identify those children failed to substantiate the accusation, as she later conceded in her deposition. Her investigation also involved using school records to identify, remove from class, and interview "any child that [Wesley] had access to." Each child contradicted J.S.'s allegations and insisted that Wesley did not abuse him or her. Given that all the interviewees exculpated Wesley of wrongdoing, a reasonable fact-finder could view the results of Rigney's investigation as positive evidence that at least this part of J.S.'s story was untrue. Once Rigney was aware that some of J.S.'s allegations were likely false, she should have questioned the veracity of his other claims. *See Fisher*, 398 F.3d at 843. Obviously, *Ahlers*'s presumption of veracity cannot survive a contradiction of this magnitude.

The record also confirms that J.S.'s allegations were improbable, both on their face and in light of Rigney's investigation of the alleged crime scene. The school's administrative area was cramped and crowded, just as Wesley described it, and several adult staff members had line-of-sight to his office. Other facts also suggested the improbability of J.S.'s allegations. For example, J.S. alleged that Wesley was nude during the sexual assaults but would leave the door to his office open and unlocked. He also said that the sodomy occurred while J.S. and Wesley were standing in front of the office's open, ground floor window. In deposition testimony, Campbell admitted that seeing "the location of Mr. Wesley's office" "cause[d] [her] . . . concern in regard to [J.S.]'s story," and the prosecutor who ultimately declined to pursue the case called the office location a "bad fact for the prosecution." Likewise, J.S. insisted that both he and Wesley were standing straight up during the sodomy. Given that Wesley was a full-grown adult, 5'10" tall, and J.S. a seven-year-old child, this physical arrangement seems completely implausible. But J.S. stuck to this description even after the CAC interviewer pressed him to change his answer.[5] J.S.'s account also contained at least one fantastical element—namely, his

---

[5]The full exchange reads as follows:

> Q: And how were you when he did that [i.e., the sodomy]? Were you standing up? Or sitting down? Or laying down?
> A: Standing up. (Gets up and demonstrates, standing up.) Standing straight up.
> Q: And how was Mr. Wesley?
> A: How was he standing?
> Q: Was he standing up? Or was he, how was he?

claim that his family members were present during one of the sodomy episodes. The unlikeliness of these allegations suggests that they are not a reliable basis on which to base probable cause.

The record also establishes that Rigney lacked any evidence corroborating J.S.'s allegations. In her appellate briefing, Rigney does not claim otherwise—instead, she insists that no such evidence was needed. She does, however, refer in passing to two facts which arguably bolster J.S.'s story: J.S.'s ability to describe details of Wesley's office such as a window and blue table and the fact that J.S. and Wesley had met for counseling appointments in the past. The district court found that these factors bolstered J.S.'s account, but they do not, in fact, constitute meaningful corroboration.

First, J.S.'s ability to describe Wesley's office plainly fails to corroborate J.S.'s abuse allegations. No party disputes that J.S. attended counseling sessions in Wesley's office or that the room contained a blue table and a window. There is no corroborating effect from J.S.'s ability to describe a location that, by all accounts, he should have been able to describe easily. For the same reason, records showing regular meetings between J.S. and Wesley do not corroborate J.S.'s allegations of abuse. These meetings were not unusual, as Wesley's job *required* him to meet with students who, like J.S., presented behavioral problems and had, in the past, attempted suicide. Moreover, Wesley's meetings with J.S. would have provided an opportunity for sexual abuse only if they occurred out of sight of the school's many potential witnesses. Rigney's investigation uncovered nothing to indicate that this was the case.

The district court identified additional factors that it believed bolstered J.S.'s account, including the fact that Wesley purportedly "honk[ed] his car horn and wav[ed]" during the February 5 car trip to the NorthKey mental health facility and the allegation that he made two outside-of-school-hours visits to J.S.'s residence—visits that were possibly contrary to school

A: Standing up.

Q: He was standing up? Um, was he standing up like standing up straight? Or standing up on the floor? Or standing on a chair?

A: He was standing. He was just standing on his legs.

Q: How about you?

A: Standing on my legs.

policy. However, Rigney herself has never claimed that any of these factors played any role in her probable-cause determination, and they are entitled to little or no weight, in our view. Even on their own terms, they fail to corroborate J.S.'s allegations.

The record also confirms J.S.'s young age, his history of psychological and behavioral problems, the negative results of his medical examination, and the inconsistent stories he told about the abuse. These factors suggest that J.S. was unreliable and that his uncorroborated allegations were unable to create probable cause.

The district court's qualified-immunity decision rested solely on its conclusion that probable cause existed for the arrest. However, a triable issue of fact exists regarding both the materiality of facts Rigney omitted from her warrant application and whether these omissions demonstrate "deliberate[ness]" or a "reckless disregard for the truth." *Gregory*, 444 F.3d at 758; *Vakilian*, 335 F.3d at 517. Accordingly, we conclude that the district judge should not have granted summary judgment on the retaliatory-arrest claim on this basis.[6]

### III. CONCLUSION

For the reasons set above, we REVERSE the district court's judgment—both the dismissal of Wesley's wrongful-arrest claim and the grant of summary judgment on Wesley's retaliatory-arrest claim—and REMAND the case to the district court for further proceedings.

---

[6]We express no opinion regarding Wesley's ability to satisfy the other elements of his retaliatory arrest claim, an issue neither addressed by the district court nor briefed by the parties.