v.

**Brian MCGIVERN, et al., Defendants-Appellees.**

No. 16-4208

United States Court of Appeals, Sixth Circuit.

Filed November 01, 2017

Justin J. Hawal, Law Office, Mentor, OH, Steven Mark Goldberg, Law Offices, Solon, OH, for Plaintiffs-Appellants

John T. McLandrich, Frank H. Scialdone, Mazanec, Raskin & Ryder, Cleveland, OH, for Defendants-Appellees

BEFORE: ROGERS, COOK, and STRANCH, Circuit Judges.

Cook, Circuit Judge.

This case involves four preteen girls, graphic accusations of sexual assault, and serious claims of bullying. C.M., F.S., and R.B. accused their schoolmate B.R. of forcing them to engage in sexual acts with her at sleepover parties. They alleged that B.R. threatened to harm them if they told anybody about the incidents. Based on information gleaned primarily from interviews with the four girls, the police arrested B.R. After a juvenile delinquency proceeding cleared B.R. of all criminal charges, B.R. and her parents sued the City of Canfield and several police officers alleging, among other claims, unconstitutional seizure. The district court granted summary judgment to Defendants on all counts, and Plaintiffs appealed. We AFFIRM.

## I.

### A. Initial Suggestions of Sexual Assault

On April 16, 2012, C.M.'s mother discovered a message written on the chalkboard in her daughter's bedroom. Signed by F.S., the message suggested that F.S. had been raped by her best friend. After informing F.S.'s mother, C.M.'s mother spoke with C.M. and R.B. about the chalkboard when the girls arrived at her house after school. C.M. gave her mother a note written by F.S. containing graphic details about B.R. forcing F.S. to engage in various sexual acts, including oral sex and vaginal penetration with a writing instrument. In addition, R.B. informed C.M.'s mother that B.R. had also sexually assaulted R.B. and C.M. The girls claimed that B.R. threatened to spread rumors at their school that C.M. and R.B. were lesbians if they told anyone. That same day, F.S.'s father called David Blystone, the former Canfield Police Department Chief, expressing concern that his daughter had been sexually assaulted. Blystone then called Chuck Colucci, the current Canfield police chief, to inform him

that he might have a new case on his hands.

On April 17, F.S.'s father met with Detective Brian McGivern and Officer Timothy Lamping at the Canfield police station. He explained that F.S. told him that B.R. sexually assaulted her twice during a sleepover at B.R.'s home in February 2012—once during the evening in the basement, and again the next morning in B.R.'s bedroom. F.S. had described the incidents as forceful kissing and removal of her clothes; she told her father that B.R. attempted digital, but only accomplished oral, vaginal penetration. F.S.'s father also reported that C.M. and R.B. claimed B.R. sexually assaulted them, prompting the officers to contact C.M.'s mother. She discussed with them F.S.'s chalkboard message and her conversation with C.M. and R.B.; she also gave the officers F.S.'s note. The officers also met with R.B.'s mother, who told them that R.B. described several occurrences of forced sexual contact by B.R, including oral sex. According to R.B.'s mother, R.B. pled with B.R. to stop attacking her, triggering B.R. to bully R.B. and spread rumors about R.B. being a lesbian.

Detective McGivern discussed the meetings with Assistant Prosecutor Anissa Modarelli. He also contacted the Mahoning County Children Services Board, requesting its assistance in investigating the matter. Children Services, however, informed Detective McGivern that it would not have a facility to interview the children for nearly three weeks. That wouldn't work for Detective McGivern: knowing that B.R. was having a sleepover birthday party only several days later, he arranged for Children Services to interview the accusers at the police station within a matter of days.

The following day, Officer Steve Garstka met with Canfield Middle School interim principal Don Dailey. Dailey knew the four girls from conflict resolution meetings. In documentation he provided to Officer Garstka, Dailey recounted that he saw R.B., F.S., and B.R. walking and talking together on April 16, "appear[ing] to [him] that possibly things are back on track." Dailey wrote that he met with F.S. and R.B. on April 17, during which time the girls "indicated that things were not good with [B.R.]" and shared that "there were some 'sexual' encounters or attempts. They spoke of 'lap dancing' and [he] believe[d] an attempted kiss." Dailey then stopped his conversation with the girls. Following the meeting, Officer Garstka shared Dailey's notes with Assistant Police Chief Scott Weamer.

### B. First Round of Interviews with R.B., C.M., and F.S.

On April 20, Kim Woods, a case worker from Children Services, interviewed R.B., C.M., and F.S. individually at the Canfield Police Department. Each interview lasted roughly 20 minutes. Nobody else sat in on the sessions, but Detective McGivern, Officer Lamping, and Assistant Prosecutor Modarelli watched live video feeds (Assistant Chief Weamer watched live feeds of C.M.'s and F.S.'s interviews).

R.B. went first. She told Woods that the first time B.R. slept over at her house, B.R. showed her pornography on her iPod. After that, B.R. "forced [R.B.] down onto her bed; with [R.B.] on her back, [B.R.] pulled off [R.B.]'s pants and underwear; [B.R.] then used two of her fingers to digitally penetrate [R.B.]'s vagina." R.B. continued, explaining to Woods that "[B.R.] forced [R.B.] to receive oral sex; [B.R.] then forced [R.B.] to digitally penetrate [B.R.]'s vagina; at that point, [B.R.] took her clothes off and proceeded to sit on [R.B.]'s face; [B.R.] forced [R.B.] to lick [B.R.]'s vagina." After this, B.R. warned R.B. that she would hurt R.B. if she told

anybody about what happened. R.B. also recounted a separate sleepover at B.R.'s house, during which "[B.R.] tried to give lap dances to and kiss [R.B.], [F.S.], and [C.M.]"

Woods interviewed C.M. next. According to C.M., she slept over at B.R.'s house the prior week, during which B.R. watched pornography. B.R. took off C.M.'s clothes and then removed her own. "[B.R.] forced [C.M.] onto the bed and then started 'licking' [C.M.]'s vagina; [B.R.] then forced [C.M.] to 'lick' [B.R.]'s vagina." C.M. continued, recounting that "[B.R.] forced [C.M.] to put her finger in [B.R.]'s 'butt'; [B.R.] reciprocated by doing the same to [C.M.]; [B.R.] told [C.M.] that she would kill her if [C.M.] didn't do as she was told." C.M. also "stated that she was forced to give and receive oral sex with [B.R.] on at least five different occurrences" and "confirmed that there was vaginal digital penetration by [B.R.] ... [C.M.] was also forced to put her fingers in [B.R.]'s vagina." B.R. said she would kill C.M. if she told anyone about what happened. C.M. also discussed another incident where B.R. allegedly forced her, R.B., and F.S. onto mats and started kissing and "humping" them.

F.S. sat for her interview last. She described for Woods a sleepover she attended with C.M. and R.B. at B.R.'s house after Christmas 2011. F.S. said that B.R. watched lesbian pornography in front of the group and suggested they all practice kissing. After F.S., C.M., and R.B. refused, B.R. tried to give them lap dances. F.S. next discussed a subsequent sleepover at B.R.'s house, at which B.R. also watched pornography and tried to give F.S. a lap dance. "[B.R.] then took [F.S.]'s pants and underwear off; [B.R.] began to 'lick' [F.S.]'s vagina as the pornography showed on the i[P]od; [B.R.] removed her clothes and forced [F.S.] to 'lick' [B.R.]'s vagina."

F.S. stated that B.R. attempted to, but couldn't, digitally penetrate her vagina. Next, "[B.R.] forced [F.S.] to digitally penetrate [B.R.]'s vagina with her fingers; [B.R.] then got a marker and put it inside of [F.S.]'s vagina," which, F.S. explained, "hurt badly." F.S. said that B.R. forced F.S. to give and receive oral sex the following morning. If F.S. told anybody about what happened, "[B.R.] threatened [F.S.] that she would 'be dead.'"

Detective McGivern, Officer Lamping, Assistant Chief Weamer, Assistant Prosecutor Modarelli, and Woods found the three girls credible.

## C. Interview with B.R.

Later that day, Detective McGivern called B.R.'s mother and asked her to bring B.R. to the Canfield Police Department. When B.R.'s mother arrived with her daughter, Detective McGivern mentioned that B.R. may be sexually active with some of her friends. B.R.'s mother didn't comment on that—but she did say that several of B.R.'s friends were bullying her at school. She agreed to let Detective McGivern and Officer Lamping interview B.R., for which she stayed in the room. The interview began after the officers read B.R. her *Miranda* rights, and B.R. signed a waiver before answering any questions.

B.R. said that R.B., F.S., and C.M. were bullying her at school. When asked if she had sleepovers with her friends, "[B.R.] took a long pause before answering yes" and confirmed that R.B., F.S., and C.M. all slept over during the 2011 holiday season. B.R. confirmed that she has an iPad that she uses in her bedroom, but declared that she never watched pornography on it. She did, however, state that R.B. once showed her pornography on an iPad while sleeping over with F.S. at R.B.'s house. After Detective McGivern "explained to [B.R.] that law enforcement was able to get all of the

deleted sites from her iPad," B.R. clarified that C.M. and R.B. had pulled up pornography on her iPad when B.R. was using the restroom. B.R. admitted to sitting on her friends' laps "but not in a weird way." She denied touching any of the other girls' private areas. After she and her mother took a break from the interview, B.R. advised that her friends (F.S. in particular) were spreading lies about B.R. having raped them at sleepovers. B.R. maintained that she did not rape any of her friends, nor did she have any type of sexual contact with them.

B.R. "appeared nervous" and "almost started to cry" when Detective McGivern said that he believed something happened to her and asked her about somebody forcing herself on her. "[S]he advised that [R.B.] makes her nervous as [R.B.] 'got up on her' one time during a sleep over. [B.R.] explained that [R.B.] [lay] on top of her but was joking and nothing happened. [B.R.] also advised that [R.B.] then got off of her and both were clothed at this time. [B.R.] then advised that [R.B.] sat on [C.M.] and [F.S.] but nothing happened that was sexual." B.R. reiterated that she did not rape any of her friends and that none of them raped her. She also repeated that she was being bullied at school by the three girls. After another break, Detective McGivern "advised [B.R.] that her three friends were accusing her of rape and that she had pulled down their pants. [He] also advised [B.R.] that they were advising that [B.R.] licked them and shoved a Sharpie Marker inside one of the girls. At this time [B.R.] advised that she did not do any of these reported crimes when the mother stopped the interview."

At her deposition, B.R.'s mother testified that she spoke with Detective McGivern during a break in her daughter's interview. She explained to him that F.S. had told B.R. that they should tell the police that R.B. raped them. B.R.'s mother also informed Detective McGivern that F.S. had sent a Facebook message to B.R. threatening to "beat[ ] the piss out of" her.

## D. Second Round of Interviews with R.B., C.M., and F.S.

According to Detective McGivern's police report, "there was enough probable cause to make an arrest for multiple counts of [r]ape" after B.R.'s interview; he decided, however, to interview the three other girls to determine if they had made false statements to Woods that morning. With B.R. detained in the booking room, Detective McGivern and Assistant Chief Weamer interviewed R.B., C.M., and F.S. one by one after reading each her *Miranda* rights. Each girl affirmed that she told the truth to Woods, although Detective McGivern and Assistant Chief Weamer advised them that they did not want to discuss details. Detective McGivern noted in his report that he did not find the girls deceitful.

Detective McGivern arrested B.R. after finishing the interviews. Officer Lamping and another officer took her to the juvenile detention center. Following the arraignment several days later, the Juvenile Justice Court placed B.R. on electronically monitored home detention in the care of her grandmother.

## E. Final Interviews with R.B., C.M., and F.S.

One month later, B.R.'s father contacted the Canfield Police Department requesting that it take a report and initiate an investigation regarding an assault against B.R. on January 6. When Juvenile Officer Paul Lasky arrived at her house, B.R. told him that R.B. had assaulted her at a group sleepover. According to B.R., R.B. got on top of her, touched her inappropriately, and would not relent. B.R. said that R.B.

then got on top of C.M. and touched her inappropriately.

Given B.R.'s criminal witness statement, Detective McGivern visited C.M.'s house about one week later and interviewed C.M. with her mother present. C.M. recalled a sleepover at B.R.'s house during the winter where, after F.S. had already left, she found B.R. and R.B. "on the floor 'humping each other.'" She said that R.B. never got on top of her or tried touching her inappropriately, and that she had not seen R.B. engage with B.R. sexually beyond what she saw on the floor.

Later that day, Detective McGivern interviewed R.B. at the Canfield Police Department. With R.B.'s mother present, Detective McGivern told R.B. about B.R.'s statement "and asked her if she and [B.R.] were 'humping.'" R.B. explained "that all of the girls were 'experimenting' and all were involved in kissing and humping.... [R.B.] then advised that all of the girls were in an agreement to experiment but they were only to kiss, hump, and lap dance." Next, R.B. stated that "[B.R.] got on top of her and 'talked' her into going farther" when the two of them were alone. "[R.B.] advised that [B.R.] asked, 'Please', in which [R.B.] granted permission to go farther in which time [B.R.] continued sexual behavior with [R.B.] [R.B.] advised that she was NOT forced by [B.R.] and simply 'talked' into sexual conduct, to include digital penetration." Detective McGivern shared this information with Assistant Prosecutor Modarelli.

R.B.'s revised story prompted Detective McGivern to interview C.M. and F.S. once more. C.M. admitted that all four girls had been experimenting sexually. Yet she insisted that B.R. forcefully raped her and that she didn't scream for help during the incident because B.R. said she would kill her. F.S. told Detective McGivern that "[R.B.] and [B.R.] were lying on each other, humping each other, and kissing each other" at the January sleepover at B.R.'s house. She admitted that she lied during her initial interview about B.R. showing the girls pornography: R.B. told her to say that B.R. pulled up the pornography, even though R.B. actually did so. Still, F.S. maintained that B.R. forcefully raped her.

## F. B.R.'s Juvenile Delinquency Proceeding

The magistrate assigned to B.R.'s juvenile delinquency case held two merits hearings in August 2012. He found reasonable doubt that B.R. committed any of the alleged acts. The juvenile court judge adopted the magistrate's decision in February 2013.

## G. Procedural History

Following B.R.'s acquittal, B.R. and her parents filed the instant case against Detective McGivern, Chief Colucci, Assistant Chief Weamer, Officer Lamping, and the City of Canfield. They alleged a violation of B.R.'s Fourth Amendment rights, false imprisonment, malicious prosecution, abuse of process, failure to train, battery, intentional infliction of emotional distress, loss of consortium, and loss of familial association. The district court granted summary judgment to Defendants on all claims. Plaintiffs appeal.

## II.

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 246 (6th Cir. 2000). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing the district court's

decision to grant summary judgment, we view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citing *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## B. Fourth Amendment Claim

Plaintiffs brought a 42 U.S.C. § 1983 claim against the officers, alleging an unlawful seizure in violation of the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *see also Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) ("In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999))). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152, 125 S.Ct. 588 (citing *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (quoting *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)).

Detective McGivern arrested B.R. for rape. Ohio Rev. Code § 2907.02(A)(1)(b) defines rape as sexual conduct with some-body younger than 13 years old. Although the Ohio Supreme Court found this section unconstitutional as applied to a child under 13 who engages in sexual conduct with another child under 13, the offender may be found guilty of rape if "the offender compels the other person to submit by force or threat of force." *In re D.B.*, 129 Ohio St.3d 104, 950 N.E.2d 528, 533–34 (2011) (citing Ohio Rev. Code § 2907.02(A)(2)).

▇ The officers had probable cause to believe that B.R. committed rape. During their initial interviews, R.B., C.M., and F.S. recounted similar stories of sexual assault. All three girls stated that B.R. showed them pornography. All three girls described B.R. forcefully undressing them. All three girls explained that B.R. forced them to participate in oral sex. All three girls reported that B.R. coerced them to engage in various acts of vaginal penetration. And all three girls indicated that B.R. threatened them with physical harm if they told anybody about the incidents. Woods, the Children Services case worker who interviewed the girls, found all three credible, as did the officers and assistant prosecutor watching the live video feeds.

Then Detective McGivern interviewed B.R. Given B.R.'s demeanor and answers during the interview—her long pauses before answering several questions, her shifting story about viewing pornography on her iPad, and denying any type of sexual conduct with R.B., C.M., and F.S.—Detective McGivern had reason to doubt B.R.'s credibility.

After Woods's interviews with the accusers and his interview with B.R., Detective McGivern determined that there was probable cause to arrest B.R. Nonetheless, he interviewed R.B., C.M., and F.S. to test the veracity of their stories. We acknowledge Plaintiffs' contention that Detective McGivern did not press the girls about the

details they shared with Woods. He did, however, Mirandize them and ask about the truthfulness of their statements. None of the girls backtracked, and, once again, Detective McGivern did not detect any deceit.

Plaintiffs list various statements B.R.'s mother made to Detective McGivern and other "facts" available to Defendants before they arrested B.R., contending that the officers made no attempt to investigate them. But upon reviewing the record, we do not conclude that the officers ignored this information. At bottom, when Detective McGivern "determine[d], on the basis of the facts and circumstances known to him, that probable cause exist[ed], [he had] no further duty to investigate or to search for exculpatory evidence." *Logsdon*, 492 F.3d at 341 (citing *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999)); *see also Klein v. Long*, 275 F.3d 544, 551 (6th Cir. 2001) ("[O]nce a police officer *has* sufficient probable cause to arrest, he need not investigate further.").

Plaintiffs argue that *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015), compels a different result. We disagree. In *Wesley*, a seven-year-old student with a history of psychological problems and suicidal impulses leveled sexual-abuse allegations against his school counselor, prompting the counselor's arrest. *Id.* at 424–27, 432. Finding probable cause, the district court dismissed the counselor's false-arrest claim. *Id.* at 427. A panel of this court reversed, noting that the child's "uncorroborated allegations were legally insufficient to create probable cause." *Id.* at 429. Plus, "[w]ithout question, [the child]'s allegations against [the counselor] were facially implausible." *Id.* at 431. The child claimed he was sodomized multiple times while in the counselor's office—located in the school's crowded administrative area and in the line-of-sight of multiple staffers. *Id.* at 431,

436. He also alleged that the counselor was nude during the assaults but left the office door open, and that both he and the counselor "st[ood] straight up during the sodomy. . . . [a] physical arrangement [that] seems completely implausible [due to their height difference]." *Id.* at 436.

Here, the allegations and accusers do not suffer the same defects. Three different children alleged substantially similar incidents of sexual assault by B.R. Their eyewitness accounts align with the information Detective McGivern learned from the girls' parents on April 17. *See United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006) ("An eye witness's statement that he or she saw a crime committed or was the victim of a crime is generally sufficient to establish probable cause."); *Ahlers*, 188 F.3d at 370 ("An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." (citation and internal quotation marks omitted)). And when Detective McGivern interviewed R.B., C.M., and F.S. following their meetings with Woods, they all affirmed that they told the truth. *See, e.g., United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006) (finding probable cause for an arrest where the officer "had spoken directly to the victim about the attempted sexual battery, and nothing about the allegation itself cast doubt on the victim's reliability"). Furthermore, the record does not suggest that the girls' claims were improbable, let alone "completely implausible," *Wesley*, 779 F.3d at 436, particularly given that the alleged incidents occurred behind closed doors during sleepovers, *see Ahlers*, 188 F.3d at 370–71 (noting that an accusation of sexual assault, "standing alone, was sufficient to establish probable cause, espe-

cially when bolstered by ... records which confirm that there was a window of time within which the alleged sexual assault could have occurred").

Could the officers have been more thorough in their investigation? Without question. Could they have, for instance, asked more detailed questions of R.B., C.M., and F.S. during their second interviews? Absolutely. But on the facts before us—and on the information known to the officers on April 20—the district court correctly found no genuine issues of material fact regarding whether Defendants had probable cause to arrest B.R. Because there was no constitutional violation, the officers are entitled to qualified immunity.

### C. *Gerstein* Hearing Claim

■ Plaintiffs also contend an issue of material fact exists concerning whether Defendants failed to ensure a probable-cause hearing for B.R. within 48 hours of her arrest. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 47, 63, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Not so. Detective McGivern arrested B.R. on April 20, and Officer Lamping transported her to the Mahoning County Juvenile Detention Center on the same day. The Defendants—the City of Canfield and its officers—did not violate B.R.'s constitutional right to a *Gerstein* hearing when she left city custody on the same day as her arrest. Accordingly, there was no violation—at least not by these Defendants—of B.R.'s right to receive a prompt probable-cause determination.

### D. *Monell* Claim

Plaintiffs allege that the officers arrested B.R. without probable cause because the City of Canfield regularly assigned police officers to investigate juvenile sexual misconduct without proper training. A municipality can be liable under § 1983 when its official "policy or custom" triggers a violation of a plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But "[t]here can be no [municipal] liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cty.*, 205 F.3d 867, 879 (6th Cir. 2000)); *see also Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004). Inasmuch as the officers did not violate the Constitution, the district court properly granted summary judgment to the City of Canfield on Plaintiffs' *Monell* claim.

### E. Malicious Prosecution Claim

Under Ohio law, a malicious prosecution claim requires (1) malicious instituting or continuing the prosecution, (2) lack of probable cause, and (3) conclusion of the prosecution in favor of the accused. *Froehlich v. Ohio Dep't of Mental Health*, 114 Ohio St.3d 286, 871 N.E.2d 1159, 1162 (2007) (quoting *Trussell v. Gen. Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732, 736 (1990)). The officers had probable cause to arrest B.R.; therefore, the district court properly granted summary judgment to Defendants on Plaintiffs' malicious prosecution claim.

### F. Remaining State Law Claims

Defendants contend that Plaintiffs did not adequately present the remaining state law claims for our review. We disagree, although we acknowledge that Plaintiffs fail to offer a nuanced development of the issues. Instead, they lump their remaining state law claims into a two-sentence paragraph at the end of their brief. They contend simply that genuine issues of material fact exist regarding their state law claims because a genuine issue of material fact

exists regarding the presence of probable cause. But as we have already explained, the officers had probable cause to arrest B.R.[1] Thus, we uphold the district court's finding for Defendants on Plaintiffs' various state law claims.

## III.

For the aforementioned reasons, we AFFIRM the district court's judgment.

COOK, J., delivered the opinion of the court in which ROGERS and STRANCH, JJ., joined. STRANCH, J. (pp. 16-22), delivered a separate concurring opinion.

JANE B. STRANCH, Circuit Judge, concurring.

I agree that the officers are entitled to qualified immunity, but because I think probable cause to arrest B.R. is a close issue, I would be more inclined to grant qualified immunity for lack of clearly establish law. I write separately to address probable cause as it relates to the constellation of issues surrounding allegations of child-on-child sexual assault. B.R., the accused, was ten years old, and her three accusers were all preteens. The ages of those involved and the actions alleged raise difficult and critical challenges for law enforcement and our society as a whole. At issue are: how allegations of child-on-child sexual assault are responded to and appropriately investigated; how and when law enforcement—as opposed to other entities—should interact with children who are accused of such misconduct; how we ensure that well-intentioned members of law enforcement are properly trained and prepared to respond and investigate;

and how the rights of both the accusers and the accused can be protected. In expressing my concerns with how the investigation and prosecution unfolded for B.R.—and how it unfolds for others like her—I do not minimize the difficulties of responding to and investigating such serious allegations made by and against children. These complex and delicate challenges magnify the importance of taking the time to properly investigate such allegations and of using trained officers to do so.

These issues are implicated by the disturbing facts set out in our opinion; other facts further underscore these concerns. Three days after the initial report, the three young accusers of B.R. were interviewed by Children's Services; B.R.'s mother was asked to bring her to the police station where B.R. was interrogated by police officers, detained, then arrested and transported in a police car to a detention center. B.R. remained in the detention facility for four days and was then brought to court for arraignment in handcuffs, with shackles around her ankles and a chain around her waist. She was remanded, not to her parents, but to her grandmother's care and placed on electronically monitored home detention for nearly two months. Shortly before that time expired and as noted in the opinion, the three accusers were re-interviewed; one recanted the rape claim, and the other two recanted many of their allegations but not the claim of rape. Despite these recantations, B.R. was kept on house arrest for another eight months, until the juvenile court hearing at which all of the allegations against B.R. were found to be "not true."[1]

1. Plaintiffs voluntarily dismissed their state law claims against the City of Canfield.

1. The opinion below rightly recognizes the she-said-she-said problems and correctly calls this case an "immense tragedy" but wrongly

comments that "the record does not prove B.R.'s innocence." *B.R. v. McGivern*, No. 4:13-CV-907, 2016 WL 5661610, at *10 (N.D. Ohio Sept. 30, 2016). B.R. was cleared of the charges against her in court. It is neither

B.R.'s arrest followed an artificially rushed three-day investigation conducted by officers who—despite their positive intentions—were seemingly unprepared to handle the complex task of investigating allegations of sexual assault made by and against children. Certainly allegations as serious as the ones made against B.R. warranted thorough and timely investigation. Protection of children against sexual assault should be a priority of law enforcement, and given that victims can be the sole witnesses in sexual assault cases, their claims should be heeded. But such allegations also require investigation that is informed by training and experience, requirements that are especially critical when the accused and accusers are children. The Supreme Court has repeatedly recognized that children are different than adults, and that the responses of our law enforcement and justice systems must reflect that. *See, e.g., Miller v. Alabama,* 567 U.S. 460, 471, 473, 477–78, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) (affirming that children are "constitutionally different" from adults and that the "characteristics" and "incompetencies" of youth, including their lack of sophistication in dealing with the criminal justice system, must be taken into account); *J.D.B. v. North Carolina,* 564 U.S. 261, 264–65, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) (holding that "a child's age properly informs the *Miranda* custody analysis" because it is "beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave"); *Graham v. Florida,* 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (acknowledging "fundamental differences" between adults and youth); *Roper v. Sim-*

*mons,* 543 U.S. 551, 569–70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (consulting scientific studies, among other sources, in recognizing that developmental and environmental differences, such as immaturity and lesser control over their environments, can result in young people being "more vulnerable or susceptible to negative influence").

I recognize that the after-the-fact recantations in this case do not control the probable cause determination that led to B.R.'s warrantless arrest.[2] But I think that they are the fruit of an investigation that was inappropriately hurried and lacked necessary grounding in how to deal with children. A probable cause determination is based on the "totality of the circumstances," and must take account of "both the inculpatory *and* exculpatory evidence." *Gardenhire v. Schubert,* 205 F.3d 303, 318 (6th Cir. 2000). Although law enforcement does not have to "conduct quasi-trials" before arrest, *Painter v. Robertson,* 185 F.3d 557, 571 n.21 (6th Cir. 1999), officers "cannot simply turn a blind eye" toward evidence favorable to the accused, *Ahlers v. Schebil,* 188 F.3d 365, 372 (6th Cir. 1999), nor can they "ignore information which becomes available in the course of routine investigations." *Fridley v. Horrighs,* 291 F.3d 867, 873 (6th Cir. 2002).

The Defendants relied on interviews of each of the three accusers to determine that probable cause existed to arrest B.R. The reliability and adequacy of the accusers' testimony is therefore the issue in this case. Two cases provide guidance. In *Ahlers,* this court found that an adult inmate's allegation that an officer assaulted her was sufficient to establish probable cause, "especially when bolstered by … records

---

necessary nor appropriate to question this result.

**2.** "Once probable cause is established, an officer is under no duty to investigate further or

to look for additional evidence which may exculpate the accused." *Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir. 1999).

which confirm that there was a window of time within which the alleged sexual assault could have occurred." 188 F.3d at 370–71. Eyewitness identification "will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Id.* at 370 (citation and internal quotation marks omitted). *Ahlers* cautioned that officers cannot make "hasty, unsubstantiated arrests with impunity" and warned against "incomplete, poorly conducted investigations." *Id.* at 371.

The cautions set out in *Ahlers* are particularly important here because the accusers were children. The second guiding case, *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015), decided after the events in this case occurred, addresses this issue. In *Wesley*, a seven-year-old male student with a history of mental illness alleged, in a changing story lacking physical or medical support, that his school counselor had sexually abused him. *Id.* at 424–26. The investigation was belated and failed to question a key witness whose location would have provided a clear view of the alleged assault. *Id.* at 425–26. After the counselor's long-delayed arrest, the case fell apart quickly. *Id.* at 427. Wesley's false-arrest claim was dismissed but we reversed, finding that his arrest lacked probable cause and noting that "[p]robable cause is created only by eyewitness allegations that are '*reasonably trustworthy.*'" *Id.* at 429 (quoting *Logsdon v. Hains*, 492 F.3d 334, 342 (6th Cir. 2007)). Though *Wesley* included accusations by only one child and other distinctions from this case, it explained and provided research supporting the importance of ascertaining a child's reliability. For example, the court referenced a law journal article which concluded that "stud-ies examining children's suggestibility have found children to be prone to conforming their stories to the beliefs of the questioning adult." *Id.* at 430 (quoting Diana Younts, *Evaluating and Admitting Expert Opinion Testimony in Child Sexual Abuse Prosecutions*, 41 Duke L.J. 691, 697 (1991)).

*Ahlers* instructs that eyewitness testimony can form the basis for probable cause, unless an officer has reason to believe that the witness is lying. And *Wesley* expresses concerns about finding probable cause based solely on a child's allegations of wrongdoing. Here, the Plaintiffs point to multiple pieces of evidence that they argue are either exculpatory or should have caused a reasonable officer to doubt the reliability of the girls' statements. This evidence, known to police prior to B.R.'s arrest, includes that: (1) B.R.'s mother told McGivern that F.S. had previously suggested to B.R. that they tell the police that R.B. raped them, and B.R. provided similar information in her interview; (2) B.R.'s mother told McGivern that F.S. sent a physically threatening Facebook message to B.R., calling into question "whether B.R. would be able to intimidate and overpower F.S. in the way that F.S. told police"; (3) the accusers continued to have sleepovers with B.R. after the alleged rapes occurred; (4) B.R.'s mother told McGivern that F.S. had been posing as a 15-year-old girl on the internet and using the word rape on the internet; (5) F.S. told the officers that her favorite television program is *Law & Order: Special Victims Unit*, an adult crime drama about the investigation of sexually based offenses, and that she wanted to be a detective; (6) both B.R. and her mother told McGivern that the girls had been bullying B.R. and other girls; (7) Principal Dailey told the Defendants that the accusers seemed to be getting along again on April 16, 2012; and (8)

the accusers were read their *Miranda* rights and subjected to custodial police interrogations only for their second interviews, in which McGivern told them he did not want to discuss the facts.

As to what the investigation actually revealed, the Plaintiffs note that there was no collection or analysis of any of the girls' electronic devices, no search for the Facebook messages that were referenced, no interviews of teachers or other students, no confrontation of the accusers with B.R.'s story or testing of the statements against each other for veracity, and no physical or medical evidence corroborating the accusers' stories. During the second interviews, McGivern specifically said that he did not want to discuss details, instead explaining the consequences of lying and asking the girls if they were lying. The speedy nature of the investigation was due to the supposed "public safety" risk of B.R.'s upcoming sleepover party. For obvious reasons, B.R.'s mother cancelled the party before B.R. was arrested. In light of the accusations of her guests, it would have been unreasonable to assume that B.R.'s party would have been held or that B.R.'s parents would not have readily cancelled the sleepover so the police could perform a complete investigation.

All these facts call several of the girls' statements into question. They suggest that F.S. may have been planning to make up a story about rape to tell the police, or that the rape accusations could have been concocted as a form of bullying. At the very least, these facts raise significant questions about the reliability of the accusers and of their accusations, questions that should have been answered through additional investigation.

The facts that underlie this case are a sad reminder of what young children are exposed to, particularly on the internet, and how that information is handled by children on the cusp of puberty. They point to the need for societal solutions and to the danger of defaulting to the assumption that our children's problems should be handled by the police. There is too often a mismatch between the needs and characteristics of children and the law enforcement and criminal justice systems in place for addressing crime. *See, e.g., If Not Now, When? A Survey of Juvenile Justice Training in America's Police Academies*, Strategies for Youth (Feb. 2013), http://strategiesforyouth.org/sfysite/wp-content/uploads/2013/03/SFYReport_02-2013_rev.pdf. As the presence of police officers in schools has increased, moreover, we risk confusing school security with school discipline, leading to the result that children are increasingly subject to criminal charges and entry into the criminal justice system. *See, e.g.,* Erik Eckholm, *With Police in Schools, More Children in Court*, N.Y. Times (Apr. 12, 2013), http://www.nytimes.com/2013/04/12/education/with-police-in-schools-more-children-in-court.html. This case presents an opportunity to consider alternate methods of addressing the problems that children, growing up in today's world, experience or cause. To the extent that these issues continue to be addressed in the criminal justice system, it is of unquestionable importance that law enforcement officers receive proper training and support in how to understand and interact with children—whether they are accusers or the accused—in a way that recognizes the unique needs and vulnerabilities of children.