[No. D053808. Fourth Dist., Div. One. Oct. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
IDA BLEICH, Defendant and Appellant.

## COUNSEL

Keith H. Rutman for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.[1]

## OPINION

**BENKE, Acting P. J.**—Defendant and appellant Ida Bleich appeals from the trial court's denial of her petition for a judicial finding of factual innocence (Pen. Code,[2] § 851.8), following the dismissal of charges that she made a terrorist threat (§ 422) and stalked the victim (§ 646.9). We affirm the trial court's order.

---

[1] Jennifer Bluver, certified law student, presented oral argument.

[2] All further statutory references are to the Penal Code unless otherwise specified.

## BACKGROUND

### A.   *The Cell Phone Threat and Appellant's Arrest*[3]

Basil Abdulahad was a pharmaceutical technician employed by CVS pharmacy. Appellant, a pharmacist, acted as Abdulahad's supervisor for six months, until he transferred to another CVS pharmacy in El Cajon, California. During the time she was Abdulahad's supervisor, appellant had occasion to call Abdulahad on his cell phone and drive him to work.

On June 7, 2008, at 3:18 a.m., Abdulahad received a message stored on his cell phone's voice mail. The message, which was laden with profanities,[4] accused Abdulahad of trying to sleep with the caller's girlfriend and purported to describe Abdulahad's activities on a recent night.[5] The caller threatened to slit Abdulahad's throat and put him in a body bag. The caller also indicated knowledge of where Abdulahad lived.

Abdulahad immediately believed the caller's voice sounded like appellant's voice, although he was not 100 percent sure. He played the message for his mother, and she, too, believed it was appellant's voice. Abdulahad, who listened to the message that afternoon, was frightened by it. Over the preceding few months, appellant had begun acting oddly toward him. She insisted Abdulahad allow her to pick him up at home and drive him to work. After he stopped accepting rides to work from appellant, she began harassing him, telling him to work harder and faster and at times seemed jealous and hateful towards him. Sometimes she would degrade him or yell at him and then turn to customers or employees and smile. She began cutting his hours at work. When confronted by Abdulahad, appellant told him that she wanted him fired. Abdulahad was certain appellant would be able to carry out the

---

[3] As detailed here, the facts surrounding the threat are taken from the evidence introduced at the July 7, 2008, preliminary hearing and the formal written petition brought on August 14, 2008. The petition appears in the reporter's transcript of August 14, 2008. Appellant's petition was supported by the preliminary hearing transcript. The People's opposition to the petition was supported by the police report written by the arresting officer, El Cajon Police Officer Darren Ehlers, on June 9, 2008, and records of disciplinary action taken against appellant for failing to account properly for Vicodin, Xanax and Viagra by the California State Board of Pharmacy prior to this action. The same judge presided over the preliminary hearing and the petition.

[4] A transcript of the message was introduced at the preliminary hearing as exhibit 2. It is presented at page 6 of the clerk's transcript.

[5] The night before the threat was made on the cell phone, Abdulahad met several friends, including two girls, near the pharmacy where he and appellant worked. The group decided to go to the Denny's restaurant in El Cajon. In the message, the caller refers to a "party" and specifically states Abdulahad went to Denny's.

threat or have one of her sons or family members carry it out for her. An hour after hearing the message, Abdulahad went to the police station to report the threat.

When El Cajon Police Officer Darren Ehlers interviewed Abdulahad on June 9, 2008, Abdulahad was visibly shaken. He was exhibiting fear and nervousness, and was trembling. He produced the cell phone with the threat on it and told Ehlers he believed the voice belonged to appellant, his supervisor. Ehlers listened to the recording and he thought it sounded like a female with a slow, rumbling, rambling voice. From his experience and training, it sounded like the person was either drunk or high on prescription drugs. At the time Ehlers did not know appellant worked at a pharmacy and had access to drugs.

Ehlers had Abdulahad make a written statement. Then, using a cassette-recording device he brought with him, Ehlers made an audiotape of the cell phone message. To make the audiotape, Ehlers placed Abdulahad's cell phone on "speaker phone" and recorded the message as it played. The cell phone caused some feedback in the recording device. After making the recording, the cell phone was returned to Abdulahad, who wanted it in case he needed to make an emergency call.

Ehlers met Officers Hays and Stoller at the CVS pharmacy where appellant worked. Abdulahad drove there separately and remained outside because he was too frightened to go into the store. The officers contacted Josephine Cavada, an assistant manager at the CVS pharmacy, and asked her to step outside, listen to the threat and see who she thought might have left the message. Cavada was given Abdulahad's cell phone and listened to the message recorded there. Cavada's eyes "went big and round" and she stated, "That's Ida. These are some serious threats. That definitely sounds like Ida to me."[6]

After identifying appellant's voice, Cavada stated she had additional concerns. She noted appellant's harassment of Abdulahad, which included

---

[6] The cell phone was not introduced at the preliminary hearing or at the hearing on the petition. Rather, the audiotape of the message was introduced. Cavada did not recognize the voice on the audiotape recording of the message. She explained the words were the same, but the audio recording sounded different. She testified that unlike the "actual voice mail on the actual phone," the words on the audiotape were "staticky" and "hard to understand." Ehlers also testified the version on the recorder introduced in court was "not the way the voice sounded" on the cell phone.

cutting back his hours for no apparent reason. In addition, customers expressed their belief appellant was stealing their pills and manipulating their narcotic prescriptions. There were also customer complaints about appellant yelling and cursing at customers and employees. Cavada was concerned because she believed appellant was working lengthy hours and was at the same time working at another pharmacy.

Following Cavada's identification of appellant's voice, Ehlers asked Cavada to bring appellant to the store office. Appellant was very defensive. She said that she was being "set up" before Ehlers said anything to her. Ehlers told appellant he was investigating threats made against an employee, but did not give her a name. Appellant responded by denying any wrongdoing and stating she "never threatened [Abdulahad]." Appellant also asked the officer if he had a recording of the threat and said the officer would have to prove it. Ehlers believed appellant's voice resembled that of the caller.

After conferring with one of the other officers and taking into account the totality of circumstances, which included the combination of a serious death threat and stalking, Ehlers arrested appellant. When Ehlers went outside and told Abdulahad of appellant's arrest, Abdulahad asked for a restraining order. Ehlers transported Abdulahad to the police station so that Ehlers could obtain an emergency protective order. Officers Hays and Stoller accompanied appellant to the police department for processing.

Before she was taken to the police station, appellant told Ehlers she did not have a purse or cell phone at the pharmacy. When Ehlers and Abdulahad arrived at the police station, Officer Hays told Ehlers that appellant had a cell phone at the pharmacy. Hays was sent back to the pharmacy to retrieve it in case it was the phone used to convey the threat. A few minutes after leaving, Hays contacted Ehlers and told him appellant's son had gone to the pharmacy and retrieved the phone.

Upon being informed the cell phone had been retrieved, Ehlers called the pharmacy. Mary Grace, an employee, told him that after appellant was arrested, she (Grace) called appellant's son, Arthur, and told him of appellant's arrest. Arthur then immediately came to the pharmacy and picked up the phone.

Ehlers called Arthur. At first, appellant's son stated he had the phone. However, after Officer Ehlers told him the phone was needed for evidence, he

denied having it. The phone then disconnected, and appellant's son would no longer answer his phone for either Ehlers or appellant.

Ehlers allowed appellant to make several telephone calls to leave messages for her sons, but when he realized she was calling the pharmacy, he reminded her the judge who issued the emergency restraining order for Abdulahad specifically forbade her from contacting the place where the alleged victim was working. Ehlers had to disconnect the receiver to terminate the call. He noted in his police report that during this period of time appellant appeared to be disoriented and "did not appear to be all there," at one point claiming to be an employee of the sheriff's department but not able to state what she did for the sheriff's department, then stating she was an employee at Las Colinas.

The parties stipulated that the cell phone record for appellant's phone number showed no calls to Abdulahad. However, the prosecution refused to stipulate or agree that the phone retrieved by appellant's son had the same phone number.

### B. *The Ruling at the Preliminary Hearing on July 7, 2008*

The court, sitting as a magistrate, found there was insufficient evidence to bind over appellant for trial and dismissed the case. The court then denied an oral motion for a factual finding of innocence pursuant to section 851.8. The court explained there was some evidence appellant made the call to Abdulahad but the evidence was not strong enough to bind her over for trial. The court, however, stated it was a "long way" from making a finding of factual innocence. The judge's ruling was based on the audio recording of the threat, which he did not believe sounded like appellant.

### C. *The Ruling on the Petition on August 14, 2008*

Following the preliminary hearing, appellant brought a formal written petition for a finding of factual innocence before the same judge who presided at the preliminary hearing. The petition also requested an order for the sealing and destruction of records under section 851.8.

At the start of the section 851.8 hearing, the court announced its tentative decision to deny the petition. The court noted that based on the audiotape, it was convinced appellant was not the caller who left the message on Abdulahad's voice mail, but circumstantial evidence led the court "to think that there might be reasonable suspicion that she had some involvement in the making

of this telephone call as an accessory or otherwise." Among other things, the court relied on (1) appellant's question to police whether there was a recording of the threat before they divulged there was any telephonic message, (2) her question whether it was Abdulahad who was the alleged victim, without Ehlers telling her the name of the victim, and (3) her denial to police that she had a cell phone at the pharmacy and the subsequent retrieval of a phone by her son.

The court also pointed out that despite appellant's comments to the contrary, "she had it out for this guy, for whatever reason. They had started out with a good relationship and other employees had seen her and heard her yelling at him and cutting his hours off." The court concluded: "[T]hese circumstances really impede the court's ability, in my view, to find that [appellant] is factually innocent of this, and that no reasonable cause exists to believe that she committed this offense. [¶] I don't think she is the direct committer of this offense, but I am unable, primarily, to make a finding that there is no reasonable cause to believe that she participated in this offense . . . ." The court denied the petition for a finding of factual innocence and also denied appellant's request the petition be withdrawn.

## DISCUSSION

### A.  *The Legal Standard for Determining Factual Innocence*

In pertinent part section 851.8 provides: "(c) In any case where a person has been arrested, and an accusatory pleading has been filed, but where no conviction has occurred, the defendant may, at any time after dismissal of the action, petition the court that dismissed the action for a finding that the defendant is factually innocent of the charges for which the arrest was made."

██  " 'Section 851.8 is for the benefit of those defendants who have not committed a crime. It permits those petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action—to purge the official records of any reference to such action. . . . Hence, much more than a failure of the prosecution to convict is required in order to justify the sealing and destruction of records under section 851.8.' [Citation.] *'Establishing factual innocence . . . entails establishing as a prima facie matter not necessarily just that the [defendant] had a viable substantive defense to the crime charged, but more fundamentally that there was no reasonable cause to arrest him in the first place.'* [Citation.]" (*People v. Adair* (2003) 29 Cal.4th 895, 905 [129 Cal.Rptr.2d 799, 62 P.3d 45], fn. omitted, italics added (*Adair*).) " ' " 'Reasonable cause' " ' is a well-established legal standard, ' "defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." ' " (*Id.* at p. 904.)

■ Importantly, the court in *Adair*, citing *People v. Scott M.* (1985) 167 Cal.App.3d 688, 697 [213 Cal.Rptr. 456], identified the principal function of the trial judge in determining factual innocence. *Adair* explains that while a defendant may be acquitted of a crime and related charges, the trial court may still find the defendant is not factually innocent. In such circumstances " '[t]he trial court does not "disagree" with the jury's verdict . . . . It refines that verdict by distinguishing between those cases where acquittal is based upon actual innocence and those where acquittal is based upon the prosecution's failure of proof.' " (*Adair, supra,* 29 Cal.4th at p. 907.) The court further explained: " ' "[F]actually innocent" as used in [section 851.8, subdivision (b)] does not mean a lack of proof of guilt beyond a reasonable doubt or even by "a preponderance of evidence." [Citation.]' [Citation.] Defendants must 'show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action . . . .' [Citation.] In sum, the record must exonerate, not merely raise a substantial question as to guilt. [Citation.]" (*Id.* at p. 909.) On appeal, we independently review the record to determine whether appellant sustained her burden of showing no reasonable cause exists to believe that she committed the charged offense. (See *Adair, supra,* 29 Cal.4th at pp. 905–907.)

Our inquiry involves resolving whether the evidence shows appellant was actually innocent and under no set of circumstances could be subjected to the criminal process or whether the evidence on the record, while inadequate for a bindover, still leaves a person of ordinary care and prudence believing there is an honest and strong suspicion appellant was guilty. The former option would lead us to conclude appellant was entitled to a finding of factual innocence, while the latter would compel us to conclude appellant was not entitled to such a finding.[7]

We conclude that while the People failed in their burden to present evidence sufficient to bind appellant over for trial, appellant failed to sustain her burden to show that she is factually innocent of the charges brought against her such that she never should have been subjected to the criminal process in the first place. (See *Adair, supra,* 29 Cal.4th at p. 905; *People v. Matthews* (1992) 7 Cal.App.4th 1052, 1056 [9 Cal.Rptr.2d 348].)

B.  *The Offenses Charged and Prosecuted*

■ It is helpful to review briefly the elements of the offenses charged and the extent of appellant's potential liability for those charged crimes. In count

---

[7] See *People v. McCann* (2006) 141 Cal.App.4th 347, 356–358 [45 Cal.Rptr.3d 868] (finding of factual innocence appropriate where appellant could not have legally violated Bus. & Prof. Code, § 2053); *People v. Laiwala* (2006) 143 Cal.App.4th 1065, 1072–1073 [49 Cal.Rptr.3d 639] (element of grand theft of a trade secret could not be proved because the information involved was not a trade secret; finding of factual innocence was proper).

1, appellant was charged with making a criminal threat pursuant to section 422. That offense is established where the following five elements are present: (1) the defendant willfully threatened to commit a crime that will result in death or great bodily injury to another; (2) the defendant made the threat with the specific intent the statement would be taken as a threat; (3) the threat was on its face and under the circumstances so unequivocal, unconditional, immediate and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat; (4) the threat caused the person threatened to be in sustained fear for his or his immediate family's safety; and finally, (5) the threatened person's fear was reasonable under the circumstances. (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605 [40 Cal.Rptr.3d 461]; *People v. Maciel* (2003) 113 Cal.App.4th 679, 682 [6 Cal.Rptr.3d 628].)

In count 2, appellant was charged with stalking under section 646.9, subdivision (a). The crime of stalking is established if a person repeatedly follows or harasses another person and makes a credible threat with the intent to place that person in reasonable fear of death or great bodily injury. (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210 [90 Cal.Rptr.2d 177].)

### C. *Analysis*

Appellant does not argue here, nor did she make an argument at the preliminary hearing, that Abdulahad was not threatened or stalked. Her sole argument was, and is, that she did not make the threat or stalk him. For this she relies exclusively on the trial judge's conclusion her voice is not on the audio recording. However, for two reasons, the value of the trial judge's factual determination is of limited use to this court.

First, the fact the trial court found there was insufficient evidence to bind over appellant for trial based on its interpretation of the evidence (or lack thereof) does not, standing alone, sustain defendant's burden of proof to show factual innocence. (*Adair, supra*, 29 Cal.4th at p. 905; *People v. Matthews, supra*, 7 Cal.App.4th at p. 1056.) In *Adair*, the trial court made a factual determination that the defendant did not murder the victim. However, as *Adair* notes, the trial judge's conclusion "[u]ltimately . . . amounted to no more than inferences and deductions that support a finding of reasonable doubt. Whether considered singly or collectively, the cited facts and circumstances fail 'to show that [no] reasonable cause exists to believe that [defendant] committed the offense' charged. [Citations.]" (*Adair, supra*, 29 Cal.4th at p. 909.)

Second, and importantly, Abdulahad's cell phone was not presented at the preliminary hearing or at the hearing on the petition. Rather, the prosecution presented the recording of the cell phone threat. The recording was not made under the best of conditions. It was made by playing the cell phone message and recording the threat onto a cassette as it played. There was feedback during the recording and the resulting audiocassette was "staticky."

Introduced during the preliminary hearing as exhibit 1, the audio recording was played for Cavada, who described it as sounding different from what she heard on the cell phone message played for her by Officer Ehlers at the time she was interviewed. She described the audio recording played at the preliminary hearing as "staticky" and "hard to understand." Officer Ehlers described the voice on Abdulahad's cell phone message as "slow mumbling rambling." He also described the taped audio recording as "not the way the voice sounded" on the cell phone.

We believe the failure of the prosecution to present an adequate recording or to introduce the actual cell phone recording made on Abdulahad's phone was an evidentiary failure that contributed significantly to the trial judge's decision not to bind appellant over for trial.

Indeed, the record, independent of the defective audio recording, provides strong evidence from which a reasonable person of ordinary care and prudence would believe appellant committed the offenses for which she was arrested and charged. (See *Adair, supra*, 29 Cal.4th at p. 905.) At the time of appellant's arrest for making a criminal threat and stalking, Officer Ehlers knew that at least two persons listening to the recorded message directly from Abdulahad's cell phone believed the voice was that of appellant. Abdulahad immediately identified the voice, although he could not be 100 percent sure. He played the tape for his mother and she, too, believed the voice was that of appellant. Abdulahad was very frightened, not only of appellant but also of her two sons, any of whom he believed was capable of harming him. He described for the officer appellant's possessive and jealous conduct toward him and her harassment of him at work.

Moreover, when the cell phone message was played directly for Cavada, a coemployee of appellant, her "eyes went big and round" and she immediately stated, "That's Ida." Cavada also went on to describe appellant's strange behavior toward Abdulahad. She informed the officer that there also had been complaints about appellant's erratic behavior toward customers, and that

based on customer complaints she had concerns appellant was stealing pills and manipulating narcotic prescriptions.

When appellant was confronted in the store soon afterward, she was not only defensive and complained about "being set up," but she also inquired about threats to Abdulahad *before* being informed he was the victim. She demanded to hear any recording of the threat. Having heard appellant's voice in person, the officer also concluded it sounded like the voice on the cell phone.

Moreover, when asked, appellant denied having a purse or cell phone at work. However, at the police station following her arrest, appellant told Officer Hays that her cell phone was, indeed, at work. When Hays was sent to retrieve it, he discovered appellant's son had come to the pharmacy and taken it. In a phone conversation, Ehlers tried to persuade her son to bring in appellant's cell phone as evidence that might assist his mother. At first he agreed, then declined. The phone disconnected and appellant's son thereafter refused to respond to calls from the officer or appellant.

Following her arrest, appellant's behavior was bizarre and erratic. Because of Abdulahad's fears of appellant and her sons, a judge issued a restraining order on an emergency basis. Despite the order, she attempted, in the presence of the officer, to call the pharmacy. Ehlers had to disconnect the receiver to stop her. The officer also described appellant as "disoriented" and not "all there," as she was claiming to be an employee of the sheriff's department. Given the serious nature of the criminal threat and stalking charges, and the totality of the circumstances, appellant was arrested.

Although it was stipulated that appellant's cell phone records did not show any calls to Abdulahad's cell phone, it was never demonstrated that the phone taken from the pharmacy by appellant's son matched appellant's cell phone records.

■  Because we conclude the prosecution's failure of proof in this case is evidentiary, and because on this record we cannot conclude the evidence completely exonerates appellant, we independently conclude the trial judge properly denied appellant's petition for a finding of factual innocence.

## DISPOSITION

The order denying Bleich's petition to seal and/or destroy her arrest records is affirmed.

McIntyre, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 13, 2010, S178026.