Filed 2/26/21  P. v. Wheeler CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C085017 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF166320) |
| v. | |
| ROLIS EDUARDO QUERO WHEELER, | |
| Defendant and Appellant. | |

Defendant Rolis Eduardo Quero Wheeler was charged with committing sodomy on a child 10 years old or younger.  (Pen. Code, § 288.7, subd. (a).)[1]  The charges were eventually dismissed on the prosecution's motion based on insufficient evidence.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

Defendant filed a petition to declare him factually innocent and to seal and destroy the record of his arrest. (§ 851.8, subd. (c).) The court denied the petition.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

On October 23, 2016, City of West Sacramento Detective Eric Palmer was notified that M.C., a four-year-old child, may have been the victim of a sexual assault. Following an investigation, the prosecution charged defendant with sodomy of a child under the age of 10 (§ 288.7, subd. (a)) and digital penetration of a child under the age of 10. (§ 288.7, subd. (b).) Defendant pleaded not guilty and was remanded into custody.

### Preliminary Hearing and Subsequent Dismissal

M.C.'s mother, A.C., testified that in 2014, she moved into Yolo House, a sober living facility. While living at Yolo House, A.C. and M.C. met defendant. The three of them participated in a prayer group together.

After leaving Yolo House, A.C. and her children attended the same church as defendant. According to A.C., while at church on Sunday, October 23, 2016, her children were "behind her" with the church deacon and a teacher for approximately 10 to 15 minutes. During that time, the deacon and the teacher allowed M.C. to go to the bathroom with his eight-year-old sister, S.C.

As A.C. walked toward the bathrooms, she saw M.C. and defendant leaving the boys' bathroom. M.C. was running from defendant and defendant was "right behind him trying to catch him . . . ." A.C. grabbed her son and "looked at [defendant], like what the hell . . . ." Defendant said M.C. "didn't want to wash his hands," he was "trying to get him to wash his hands." M.C. was dressed at the time he emerged from the bathroom. A.C. and her children went back into the church service, after which M.C. went to the children's class.

Following church services, A.C. and her children went to lunch. According to A.C., M.C. only "picked at" his lunch. A.C. then took her children home. M.C. seemed "withdrawn and out of it."

At home, M.C. used the bathroom. A.C. went in to help M.C. wipe after he defecated and she saw the "whole toilet was filled with blood" and M.C.'s anus appeared "open." A.C. testified that she wiped her son's anus with toilet paper, which absorbed some of the blood. A.C. asked her son what had happened, but he told her to shut up. He did not want to talk about it. A.C. bagged up the toilet paper, put clean clothes on M.C. and sent him out to play with his sister.

A.C. then spoke to Sharon Green, with whom she and the children were living. Green was the church pastor's widow and also a preacher at the church who conducted "recovery meetings." A.C. showed Green the bloody toilet paper and told her it came from M.C.'s rectum. Green said they should call M.C. back in and talk to him.

A.C. called M.C. to come back inside. M.C. came in and sat on Green's lap. According to Green, M.C. sat crossed legged, facing her, and "looked right in [her] eyes." She asked him what happened in the church bathroom. He responded: "he hit me in the butt with his yucky pee-pee." M.C. did not mention defendant by name.

A.C. and Green then called two of the church elders who advised the women to take M.C. to the hospital and call the police. A.C. and Green took M.C. to Mercy San Juan Medical Center where they spoke with police. Thereafter, they took M.C. to another facility for a forensic examination. City of West Sacramento Detective Eric Palmer reported the results of the physical forensic examination were inconclusive.

According to Detective Palmer, M.C. was interviewed three days after the alleged assault, in a center for forensic interviews. Detective Palmer observed the interview through a one-way mirror, and noted that M.C. was very active during the interview and the interviewer had to "really get his attention to ask the questions that she was trying to ask." When asked what happened in the church bathroom on October 23, 2016, however,

3

M.C. repeatedly said, "[defendant] . . . stuck him with his yucky pee-pee in his butt." M.C. also was given a doll during the interview. He turned the doll face down and "poked his finger right where the butt would be on the doll, and he said, [defendant] touched me here."

At the end of M.C.'s interview, Detective Palmer remembered the interviewer asking M.C. if anyone told him what to say. M.C. replied, yes, his mom. The interviewer did not ask M.C. any follow-up questions.

S.C., was interviewed that same day. Detective Palmer testified that S.C. remembered her brother saying he was stung on his "butt" by a bee. M.C. also told S.C. that was a lie, that defendant touched M.C.'s "butt" with his penis. Counsel for defendant then read the following excerpt from S.C.'s interview into the record: "Um, after school he said that, um, [defendant] did it to him, but first after he said [defendant] did it to him he said that a bee stung him in the butt?" Detective Palmer acknowledged S.C.'s statement was ambiguous.

Detective Palmer also testified that, during his investigation, he learned defendant admitted to police that he had been in the bathroom with M.C. Defendant told police that M.C. came into the bathroom while defendant was washing his hands. M.C. "went to use the restroom . . . and [defendant] told him to make sure and wash his hands." When M.C. was done, however, "he ran out of the bathroom" and defendant "went out after him and . . . picked him up like a sack of potatoes and carried him back to the restroom to have him wash his hands." Defendant and M.C. were in the bathroom for about three minutes. Defendant denied "any sexual contact with" M.C.

At the conclusion of the preliminary hearing, defendant argued the evidence was insufficient to support the charges and asked the court for a "no holding order." The court agreed in part and did not hold defendant over on the charge of digital penetration; the court did, however, hold defendant over on the sodomy charge.

On November 15, 2016, the prosecution filed an information charging defendant with a single count of sodomy of a child under the age of 10. (§ 288.7, subd. (a).) Defendant pleaded not guilty and he was released from custody with a GPS monitoring system.

After receiving the results of forensic testing we summarize *post*, the prosecution moved to dismiss the single charge pending against defendant "based upon insufficient evidence" on March 27, 2017. The trial court granted the prosecution's motion. Thereafter, defendant filed a petition seeking a declaration of factual innocence pursuant to section 851.8, subdivision (c).

### Factual Innocence Petition and Hearing

On May 9, 2017, defendant filed a petition seeking a declaration of factual innocence pursuant to section 851.8, subdivision (c). In support of his section 851.8 petition, defendant argued that critical evidence was unavailable at the preliminary hearing: DNA testing and the results of the forensic medical examination of M.C. He also argued A.C. and M.C. were not credible witnesses and the physical evidence was "wholly inconsistent" with the allegations of sexual abuse.

Defendant submitted several documents in support of his petition, including the results from the forensic medical examination of M.C., conducted the same day as the alleged assault, which read, "Normal exam: can neither confirm nor negate sexual abuse." The report further summarized the results: "4 year old male, Tanner I stage of sexual development. External genitalia is normal. Penial shaft is normal, uncircumcised, and Urethral tissues are normal. Scrotum is normal. Perineum is normal. Perianal tissues are red/brown with some debris. This exam has normal findings as the anal redness is common at this age due to hygiene."

Defendant submitted a forensic report concerning the analysis of both M.C.'s underwear and the toilet paper collected by law enforcement. Those tests concluded there was no blood or seminal fluid in M.C.'s underwear and no blood or seminal fluid on

5

the toilet paper. The report also revealed there was no evidence of defendant's DNA either in M.C.'s underwear or on the toilet paper.

Defendant quoted several excerpts from M.C.'s forensic interview, in an effort to demonstrate the child could not answer basic questions.[2] As recorded in defendant's brief, the following is part of the exchange between M.C. and the forensic interviewer: "Q: Okay. So [M.C.], if I ask you a question and you don't know then just say, I don't know, okay? If you don't know the answer. [¶] A: Okay. [¶] . . . [¶] Q: All right. So let's -- let's try it okay? [¶] . . . [¶] Q: Let's try it. [M.C.], what is my mom's name? [¶] A: You say (unintelligibile). [¶] Q: Do you know my mom's name? [¶] A: I, yeah. [¶] Q: You know my mom's name? [¶] A: What her name? [¶] Q: You don't - do you know? So, if you don't know, just let me know, okay? [¶] A: I do know. [¶] . . . [¶] Q: Okay, so [M.C.] sometimes I make mistakes okay? If I make a mistake you can tell me I'm wrong, okay? [¶] A: Uh. [¶] Q: So [M.C.] if I say you look 10 years old what do you say? [¶] A: Bow. [¶] Q: Are you 10 years old? [¶] A: Yeah, I'm four. [¶] . . . [¶] Q: . . . [M.C.] are you a boy or a girl? [¶] A: A bear. [¶] Q: A what? [¶] A: A bear. [¶] Q: A bear? [¶] A: Yeah, a kid. [¶] Q: Okay, are you a boy or a girl? [¶] A: A kid. [¶] Q: Okay, . . . ."

Defendant also submitted numerous declarations and documents to support his claim that A.C. is not credible. These declarations said A.C. was a liar, a drug addict, a bad mother and had previously lost custody of her children to CPS multiple times, paranoid, believed her son and angry because defendant had rejected her intimate advances. There was an allegation that A.C. previously accused a different church member of inappropriately touching S.C.

---

[2] The record on appeal does not include a transcript of either M.C. or S.C.'s interview.

The hearing on defendant's petition was presided over by the same judge who presided over the preliminary hearing. At the hearing, defendant introduced a surveillance video, showing he and M.C. entering the bathroom together and leaving together after approximately three minutes.

Defendant argued the forensic evidence alone exonerated him. He also challenged the credibility of A.C., M.C., and Green as witnesses. Defendant argued it was A.C. who suggested to M.C. that defendant assaulted him and told him what to say. He pointed to A.C.'s history of drug abuse and her history with child protective services as evidence that she was unreliable. He noted her social media presence, identifying posts wherein she "called for street justice of [defendant]," and made reference to demonic possession. Relying on a declaration submitted by another church member, defendant also argued he was not the first person in the church that A.C. had accused of sexually abusing one of her children.

The trial court acknowledged A.C. was a challenging witness for the prosecution, but did not find her not wholly incredible. Additionally, the court said it "did not buy" defendant's argument that A.C. directed M.C. to say that defendant sexually assaulted him and " 'hit [M.C.] in the butt with his yucky pee-pee.' " The court did not believe that was feasible given the timing of M.C.'s statement to Green and M.C.'s age.

Defendant also suggested Green's testimony was unreliable because she suffered from bipolar disorder. The trial court took umbrage at the inference that simply because she may have bipolar disorder that Green was inherently unreliable as a witness. The court stated that it had observed Green during the preliminary hearing and found her to be a credible witness.

After considering the evidence submitted, argument of counsel, and testimony from the preliminary hearing, the court denied the petition. In reaching its decision, the court noted defendant was alone in the bathroom with the child for about three minutes. The court found defendant's decision to carry the child back into the bathroom

7

purportedly to wash his hands troubling, finding it "presupposed some degree of control and direction that this person might have over that four-year-old." The court also could not ignore M.C.'s repeated statement that defendant " 'hit me in the butt with his yucky pee-pee,' " a statement which the court found M.C. made without prompting. Those facts together, the trial court ruled, established reasonable cause to believe defendant committed the offense.

## DISCUSSION

Defendant contends the trial court erred in denying his petition to declare him innocent of the charge of sodomy of a minor. We disagree.

### A. Statutory Framework

"In any case where a person has been arrested, and an accusatory pleading has been filed, but where no conviction has occurred, the defendant may, at any time after dismissal of the action, petition the court that dismissed the action for a finding that the defendant is factually innocent of the charges for which the arrest was made . . . . The hearing shall be conducted as provided in subdivision (b)." (§ 851.8, subd. (c).)

"A finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that *no reasonable cause exists* to believe that the arrestee committed the offense for which the arrest was made. In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense for which the arrest was made." (§ 851.8, subd. (b), italics added.)

" ' " 'Reasonable cause' " ' is a well-established legal standard, ' "defined as that state of facts as would lead a man of ordinary care and prudence to believe and

8

consciously entertain an honest and strong suspicion that the person is guilty of a crime." ' [Citations.] To be entitled to relief under section 851.8, '[t]he arrestee [or defendant] thus must establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion that the person arrested [or acquitted] is guilty of the crimes charged.' " (*People v. Adair* (2003) 29 Cal.4th 895, 904 (*Adair*).) Section 851.8 establishes "an objective standard for assaying factual innocence." (*Adair*, at p. 905.)

Defendant bears a heavy burden in petitioning for a finding that he is innocent. " ' "[F]actually innocent" as used in [section 851.8(b)] does not mean a lack of proof of guilt beyond a reasonable doubt or even by "a preponderance of evidence." [Citation.]' [Citation.] Defendants must 'show that the state should never have subjected them to the compulsion of the criminal law — because *no objective factors justified official action . . . .*' [Citation.] In sum, *the record must exonerate, not merely raise a substantial question as to guilt.*" (*Adair, supra*, 29 Cal.4th at p. 909, italics added; See also *People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1459 (*Esmaili*) [A petitioner's burden to establish factual innocence has been described as " 'incredibly high' " and as requiring " 'no doubt whatsoever' "].)

## B. Standard of Review

"In an appeal from a trial court's order on a petition for a determination of factual innocence under section 851.8, we defer to the trial court's factual findings to the extent they are supported by substantial evidence, but independently review the record to determine whether the defendant sustained his burden of showing that no reasonable cause exists to believe he or she committed the charged offense." (*Esmaili, supra*, 213 Cal.App.4th 1449, 1457-1458, citing *Adair, supra*, 29 Cal.4th at p. 906; *People v. Bleich* (2009) 178 Cal.App.4th 292, 300 (*Bleich*).)

9

### C. Sodomy of a Child Under 10 Years Old

Section 288.7, subdivision (a),provides in pertinent part: "Any person 18 years of age or older who engages in . . . sodomy with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 25 years to life." Sodomy, is defined as "any penetration, no matter how slight, of the anus of one person by the penis of another person." (§ 286, subd. (a); See CALCRIM No. 1127.) Ejaculation is not required. (See *People v. Singh* (1923) 62 Cal.App. 450, 452 (*Singh*).)

### D. Analysis

It is undisputed that defendant was alone in the church bathroom with M.C. for approximately three minutes. It is further undisputed that in response to questions about what happened in that bathroom, M.C. repeatedly said that defendant "stuck him with his yucky pee-pee in his butt" and later used a doll to demonstrate what happened. These undisputed facts establish reasonable cause to believe defendant sodomized M.C. Again, reasonable cause is not guilt beyond a reasonable doubt or even preponderance of the evidence, it is only the conclusion that "no objective factors justified official action." (*Adair, supra*, 29 Cal.4th at p. 909.)

Defendant argues it was factually "unlikely" for him to have sodomized M.C. in the church bathroom because the bathroom was too public and three minutes was not enough time to undress M.C., sodomize him, then redress him. This argument does not further defendant's claim. Whether this series of facts make it "unlikely" or perhaps difficult for defendant to have sodomized M.C. in the church bathroom, they do not make it impossible for him to have done so. Sodomy requires only the slightest penetration. (§ 286, subd. (a); CALCRIM No. 1127.) And it does not require the perpetrator to ejaculate. (See *Singh, supra*, 62 Cal.App. at p. 452.)

Defendant also argues the forensic evidence renders the claim of sexual assault unreasonable. We disagree. (See *People v. Gammage* (1992) 2 Cal.4th 693, 700, quoting

10

*People v. Poggi* (1988) 45 Cal.3d 306, 326 [" 'In California conviction of a sex crime may be sustained upon the uncorroborated testimony of the prosecutrix' "].) The lack of forensic evidence may make it difficult to prove the sexual assault beyond a reasonable doubt, but when there are repeated claims of the sexual assault and the opportunity to have committed the assault—there remain objective factors to justify official action. (*Adair, supra*, 29 Cal.4th at p. 909.)

Defendant further argues it was factually "unlikely" he assaulted M.C. because S.C. was in the adjoining bathroom and did not hear M.C. crying out for help, nor was M.C. crying when he ran out of the bathroom, and A.C. did not immediately notice something was wrong with M.C. Whether these circumstances make it unlikely the defendant committed the charged offense is beside the point. Defendant was required to establish that "*no reasonable cause exists* to believe that he committed the offense." (§ 851.8, subd. (b).) Stated slightly differently, " 'Establishing factual innocence . . . entails establishing as a prima facie matter not necessarily just that the arrestee had a viable substantive defense to the crime charged, but more fundamentally that there was *no reasonable cause to arrest him in the first place*." (*People v. Mazumder* (2019) 34 Cal.App.5th 732, 738-739 (*Mazumder*), quoting *People v. Matthews* (1992) 7 Cal.App.4th 1052, 1056; *Bleich, supra,* 178 Cal.App.4th at p. 300.)

Moreover, none of circumstances highlighted by defendant necessarily renders it "unlikely" for defendant to have assaulted M.C. It is impossible to say how any particular four-year-old child would respond to being sexually assaulted. He may have been too scared to cry out, he may have been threatened to remain silent. And, if M.C. was not hysterical when he ran out of the bathroom, in those moments before returning to the church services, it is not unreasonable that A.C. failed to notice anything was wrong. The facts defendant relies upon do not satisfy his burden.

Defendant also challenges the credibility of M.C.'s statement. As he did in the trial court, defendant contends the child had "obvious difficulties differentiating accurate

from inaccurate statements" and was subject to A.C.'s suggestions that defendant abused him. There is, however, scant evidence in the record to show that M.C. was influenced by his mother to say he was sexually abused by defendant. The trial court reached the same conclusion: "I don't buy the idea [A.C.] planted the idea in the four-year-old's mind."

Additionally, M.C. was only four years old at the time of the alleged assault and interview. It is not a revelation that young children have "limited verbal and cognitive abilities" and that such limitations make it difficult to prosecute claims of child sexual abuse. (See *In re Cindy L.* (1997) 17 Cal.4th 15, 28.) M.C.'s inability to focus and answer basic questions during the interview do not render him uniquely unreliable. And while such limitations may make it difficult to convict defendant of sexual abuse, they do not render the victim's repeated claims of abuse irrelevant in determining whether there is reasonable cause to believe defendant sodomized him.

Defendant relies on *Wesley v. Campbell* (6th Cir. 2015) 779 F.3d 421 (*Welsey*), in support of his contention that M.C.'s statement alone is insufficient to find reasonable cause he committed the alleged sexual assault. The Sixth Circuit's analysis is not binding on us. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3; *Howard Contracting, Inc. v. G.A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 52 ["federal decisional authority is neither binding nor controlling in matters involving state law"].) Moreover, *Wesley*, a federal civil rights lawsuit, is clearly procedurally and factually distinguishable from the instant case.

In *Wesley*, a seven-year-old child accused the plaintiff, a school counselor, of sexual abuse. (*Wesley, supra*, 779 F.3d at pp. 424-425.) The plaintiff was arrested and charged. (*Id.* at p. 427.) A grand jury subsequently declined to indict him and the charges were dismissed. (*Ibid.*) Following the dismissal of those charges, Wesley filed a civil rights lawsuit against the arresting officer and others alleging false arrest and retaliatory arrest. (*Ibid.*) The defendant officer moved to dismiss the complaint pursuant

12

to under Federal Rule of Civil Procedure, rule 12(b)(6), and the district court granted the motion as to the false arrest claim finding that probable cause supported the arrest and that the defendant officer was qualifiedly immune in any event. Later, the defendant moved for summary judgment on the remaining claim, which the trial court also granted, ruling that the officer had qualified immunity. (*Ibid.*)

The circuit court identified the issue as whether the alleged victim's uncorroborated allegations created probable cause for the plaintiff's arrest. If so, the officers had qualified immunity. (*Wesley, supra*, 779 F.3d at p. 427.) "To survive dismissal on that basis, the plaintiff must 'allege [ ] facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." ' [Citations]" (*Ibid.*) "Plaintiffs need not meet a 'probability requirement,' although they must show 'more than a sheer possibility that a defendant has acted unlawfully.' [Citation]" (*Id.* at pp. 427-428.)

The district court granted the arresting officer's motion to dismiss the complaint. Thereafter, Wesley appealed and the Sixth Circuit concluded Wesley alleged sufficient facts to demonstrate the arresting officer lacked probable cause to arrest him. (*Wesley, supra*, 779 F.3d at pp. 427, 433.) In reaching its decision, the Sixth Circuit found the child who made the accusation of sexual abuse was not reliable because he had a history of " 'severe mental and emotional problems.' " (*Id.* at p. 432.) The child also "struggled unsuccessfully to tell a consistent story with regard to the . . . sexual abuse he endured." (*Ibid.*)

The Sixth Circuit also concluded that the accusations were factually implausible because the alleged abuse occurred on multiple occasions over a one-year period, in an office located within "an extremely well-traveled hallway at the center of the school's 'administrative hub,' located between the faculty mailroom and the principal's office and directly facing the school secretary's desk." (*Wesley, supra*, 779 F.3d at p. 431.) Moreover, the plaintiff alleged his door was open whenever he met with students and

13

"multiple school staff members had a direct line of sight" into his office. (*Ibid.*) Based on these alleged facts, the court concluded it unlikely the "severe sexual abuse" described by the child could have "continue[d] for so long undetected." (*Ibid.*)

Along with the unreliability of the witness and the factual implausibility of the allegations, the court in *Wesley* noted there was no corroborating evidence of the abuse, including no physical evidence. (*Wesley, supra*, 779 F.3d at pp. 432-433.) The *Wesley* court expressed doubt as to whether the lack of physical evidence was probative, noting there was some disagreement in the literature about whether a child will always suffer physical harm as the result of sexual abuse. (*Ibid.*) But because the appeal was from a motion to dismiss, any doubt had to be resolved in the plaintiff's favor. (*Id*. at p. 433) In ruling on a motion to dismiss under Rule 12(b)(6), the district court must " 'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.' " (*Id*. at p. 428.) In response to a motion to dismiss, the plaintiff must only "plausibly allege" that the arrest was unsupported by probable cause. (*Id*. at p. 429.) The plaintiff met this standard, because he alleged facts "allowing the fact-finder to infer some 'apparent reason to question [the victim]'s reliability.' [Citation]" (*Id*. at p. 430.) Obviously, this standard is quite different from conclusively establishing that " *no reasonable cause exists* to believe that the arrestee committed the offense for which the arrest was made." (§ 851.8, subd. (b), italics added.) As our Supreme Court has held, in the factual innocence context, if there is "any reasonable cause" to believe the defendant committed the offense, the petition must be denied. (*Adair*, *supra*, 29 Cal.4th at p. 908; see also *Mazumder, supra,* 34 Cal.App.5th at pp. 738-739 [defendant must establish there was "*no reasonable cause to arrest him in the first place*"].)

The instant case is also distinguishable from *Wesley* on the facts. Here, while there also is no physical or corroborating evidence to support M.C.'s claim of abuse, M.C. has been consistent in his description of the abuse: "he hit me in the butt with his

14

yucky pee-pee."  In addition, there is no evidence that M.C. has any mental or emotional problems, much less problems that could be described as "severe," that rendered his accusation unreliable.  Defendant points to M.C.'s behavior during the interview as evidence that he has "cognitive and behavioral difficulties" but points to no evidence in the record that M.C.'s behavior was anything out of the ordinary for a four-year-old child, or that the purported "cognitive and behavioral difficulties" rise to the level of "severe mental and emotional problems."  (*Wesley, supra*, 779 F.3d at p. 432.)  And, unlike in *Wesley*, this was not a claim of repeated abuse, over a long period of time, in a public place, in the direct line of sight of other adults.  (*Id.* at p. 431.)  M.C. complained of a single incident of abuse, when he was alone with defendant, in a bathroom, with the door closed.

Finally, defendant argues the trial court denied his petition based on speculation about "possible crimes other than what was charged."  In support of this argument, defendant relies on the following remark made by the court during the hearing on defendant's petition:  "The Court has a lot of things to show there wasn't, perhaps, any penetration or anything.  But the Court is troubled by the statement of a four-year-old and the fact that the [d]efendant and the four-year-old were alone in the bathroom for a period of time."

We interpret the court's statement differently than defendant.  The statement does not demonstrate the court's intention to deny defendant's petition because the court thinks a crime other than sodomy may have been committed.  The statement demonstrates the court's reasoning in reconciling in its mind the lack of physical evidence on the one hand, with the child's repeated statement that he was abused, the opportunity to commit the abuse, and defendant demonstrating what the court found to be an inappropriate degree of control over M.C., on the other hand  Our interpretation of the court's statement is supported first by the presumption that the trial court knows the law and properly performed its duty. (Evid. Code, § 664.)  Our interpretation also is

15

supported by the trial court's ultimate ruling on defendant's motion: "The question here is whether or not there was reasonable cause to believe that the [d]efendant committed *this offense. . . .* [¶] . . . [¶] You asked that question: What more could there have been? If there had been the child had simply come out of the bathroom and the accusation had been made without him making a statement as to his statement, 'He hit me in the butt with his yucky pee-pee,' there would certainly be a sense that, well, he was alone with the child, we don't know anything else. Certainly the court would easily find that the [d]efendant was factually innocent based on all of the other evidence. But the Court cannot make the substantial step based on the statements of the four-year-old, and I won't sweep that under the rug and disregard it. And for that reason, the Court will deny your motion." (Italics added.)

We agree that the People's case was weak—one they likely would not have been able to prove beyond a reasonable doubt and appropriately dismissed. M.C. and A.C. both presented challenges as witnesses and there was no forensic evidence to support M.C.'s repeated claim of abuse. A weak case, however, does not equal factual innocence. To succeed on his petition, defendant was required to prove there were no objective facts to justify official action (*Adair, supra*, 29 Cal.4th at p. 909), i.e. there was "no reasonable cause to arrest him in the first place." (*Mazumder, supra,* 34 Cal.App.5th at pp. 738-739), and he failed to do that. M.C. repeatedly and consistently accused defendant of conduct that amounts to sodomy and defendant had the opportunity to commit the crime. Those objective facts alone justify official action.

16

## DISPOSITION

The order denying the petition for a finding of factual innocence is affirmed.


/s/
_____
MURRAY, J.

We concur:


/s/
_____
BLEASE, Acting P. J.


/s/
_____
RENNER, J.