Filed 7/26/22 P. v. Findlay CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

|  |  |
|---|---|
| THE PEOPLE, | C094502 |
| Plaintiff and Respondent, | (Super. Ct. No. CR2021-0116) |
| v. | |
| SANDER IAN FINDLAY, | |
| Defendant and Appellant. | |

Defendant Sander Ian Findlay continuously banged and kicked a neighboring apartment door one night while naked and shouting vulgarities. The three women inside the apartment were fearful he was trying to attack them. The jury found defendant guilty of stalking the women. On appeal, defendant argues the stalking convictions lack substantial evidence. We affirm.

1

FACTS

At defendant's jury trial, his roommate, C.T., testified that on the night of January 18 and the morning of January 19, 2021, defendant consumed 8 to 12 cans of beer and played his music so loud C.T. felt it could damage his ears through the walls. Over several hours, defendant progressively disrobed until he was walking around the apartment naked. The roommate's argument about defendant's behavior became physical, with defendant kicking C.T. in the stomach. C.T. became worried the situation would spiral more out of control, so he went to a neighboring apartment where three women lived. When he was in the neighbors' apartment, one of the women called 911. After he spoke with police about what was happening and they left, C.T. went back to his apartment where he again argued with defendant and defendant called him "a coward for reporting him to those girls . . . for trying to flee over there . . . for trying to hide behind the cops." C.T. slept on the outdoor furniture of the apartment complex, but heard defendant later yelling and pounding on a door before being arrested around 6:00 a.m.

K.T., one of the women who lived in the neighboring apartment, testified she was woken up the morning of January 19 by C.T.'s urgent knocking on their door. They let C.T. in and immediately locked the door because defendant "was naked, and it is 4:00 in the morning. And [C.T.] was very stressed." She said defendant walked into his apartment when they opened the door, and "he might have said something, but just sort of like in surprise that I opened the door." The women then called 911 for C.T., who went back to his apartment.

After the police left, K.T. started hearing a "slow knocking every five minutes or so." Then "the doorbell start[ed] ringing . . . . And it was -- it was slow. It was like a scary move [*sic*]. It was creepy." They could see through the door's peephole it was defendant, who was still naked. She explained she was scared because she is "a young woman and I know I cannot defend myself. Because the man outside is naked and mad. . . . I was scared because it was the middle of the night." She also heard him ask some

2

variation of whether someone was inside around 10 times in an "[a]ggressive" and unfriendly tone before calling the police again around 5:30 a.m.

While waiting for police, there was a pause of a few minutes in the knocking, with the knocking increasing to a "constant" banging and kicking on the door, and then shouting, which she thought "was definitely directed towards" the women. Defendant also tried to move the door handle. One of the women recorded the banging and yelling on their phone, and this recording was played for the jury.

K.T. said around 6:00 a.m. defendant yelled, "[I]s there a vagina in there?" When asked whether she knew what his intentions were, she replied: "Yes, because of the word vagina and the nakedness, so it seemed pretty clear to me." She and another roommate were getting "terrified" waiting for police, so they "called again," saying she "may have called three times, but we called until somebody finally came." She was scared because their first-floor apartment's window was broken, which could allow defendant to get in that way.

J.G. and A.M., the other two women living in the apartment across from defendant, also testified to the incident. They similarly testified to C.T. coming to their apartment shaken up from a dispute with defendant and the later incessant knocking on their door. J.G. said she was "terrified" because "there was a naked man outside my apartment pacing. And we lived in [*sic*] the first floor and we did have a patio, so I was concerned he was going to jump the patio." J.G. also heard screaming and defendant saying, "Is there vaginas in there? Are there vaginas in there?" She took defendant's actions as a threat because, based on what he was doing and saying, she "assumed that if he were to break down that door, that he would do something to us."

A.M. similarly said she "felt violated and threatened. I felt a clear sense of an attack at my home." She also heard defendant say, "I want to get in or . . . I want to see the vaginas in there." This made her "very scared. It was an incredibly unprovoked

3

scenario to be in, and I was using all of the emergency safety that I could think of to protect myself."

Police officers also testified at trial. One of the officers that arrived the first time said he was sent to the complex again at around 5:34 a.m. He told defendant to stop ringing doorbells, but he then saw defendant go to press the neighbor's doorbell to defy the officer's orders. He did not speak with the women in the neighboring apartment this time. This officer returned at 6:07 a.m. and spoke with the women who seemed scared; he then arrested defendant. Another officer testified that after defendant's arrest and while handcuffed in the officer's car, defendant made three separate comments about "harming" and "stabbing" his neighbors. A video recording from the car was played for the jury.

Defendant testified in his defense, saying he was unaware of the women's fear of him that night. He claimed he was ringing doors in the complex to ask for the apartment management's emergency overnight number. But he admitted it was him on the recording saying, "[I]s the vagina in there," cursing, and repeatedly knocking on the door and ringing the doorbell. Defendant also admitted the police told him the second time they arrived to stop ringing the neighbors' doorbell, but he did not intend to follow their orders.

The jury found defendant guilty of three counts of felony stalking (Pen. Code, § 646.9, subd. (a)),[1] one count for each of the three women, and guilty of misdemeanor disturbing the peace (§ 415, subd. (2)). But it acquitted him of misdemeanor battery (§ 242) against C.T. On July 1, 2021, the trial court suspended imposition of sentence and placed defendant on two years of formal probation.

---

[1] Undesignated statutory references are to the Penal Code.

4

DISCUSSION

Defendant contends all three of his convictions for stalking must be reversed because there was insufficient evidence he threatened the victims or ever intended to place them in fear for their safety. He also claims "no evidence demonstrated that [he] actually knew all three women were present in the apartment . . . [a]nd, the evidence never showed that anyone was in any true danger."

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' [Citations.] All conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence. [Citation.] Reversal on this ground is unwarranted unless ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.] This standard applies whether direct or circumstantial evidence is involved. [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.)

The crime of stalking requires proving the defendant: (1) maliciously harassed or repeatedly followed another, and (2) made a "credible threat," with (3) "the intent to place that person in reasonable fear for his or her safety." (§ 646.9, subd. (a); CALCRIM No. 1301; *People v. Bleich* (2009) 178 Cal.App.4th 292, 301.) Harassment is defined as knowingly engaging in "two or more acts occurring over a period of time, however short," that are "directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subds. (f), (e).) A credible threat is a verbal, written, or implied threat "made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety." (§ 646.9, subd. (g).) "It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Ibid*.)

5

There was plentiful evidence supporting each stalking element.[2]  For harassment, defendant repeatedly rang the neighbors' doorbell, knocked on their door, then escalated to banging and kicking the door while yelling vulgar statements.  He also did this in increasing intervals over at least an hour early in the morning.  The women unanimously testified that this behavior terrified them.  This is evidence defendant maliciously alarmed, annoyed, and/or terrorized the women multiple times.

Defendant also made a credible threat.  Defendant kicked and banged the door with such violence the women believed he could break down the door.  And if that didn't work, they believed he would find another way in, either through the broken window or the patio, both being accessible because they lived on the first floor.  Once inside, they thought defendant intended to harm them.  Given defendant's prolonged aggressive acts, nakedness, and sexually aggressive statements, it was reasonable for the women to believe he intended them harm and had the means and motive to carry out his threats.

Finally, there is evidence defendant intended to make the women fearful for their safety.  Contrary to defendant's assertions, there is evidence he knew the neighbors were inside their apartment that night.  K.T. testified to seeing defendant standing outside their door when they let C.T. into their apartment and that he saw them open the door and let C.T. in.  C.T. also testified defendant berated him for "reporting him to those girls."  And defendant would not have continued his tireless barrage on their door if he truly did not think anybody was inside the apartment.

There was evidence defendant knew the women were frightened.  He was ringing the doorbell, banging and kicking the door, and shouting outside of the door for at least an hour while playing music so loud his roommate thought his hearing could be damaged.  He also increased the frequency and aggressiveness of his harassment as the

---

[2] The parties' arguments assume all three victims are similarly situated, so we likewise apply our analysis collectively to the three victims.

morning progressed and yet the women still did not answer the door. From this evidence, the jury could have reasonably concluded defendant knew the women heard him, given the extreme disturbance he created, but were too scared to answer the door. The police even told defendant earlier to stop ringing the neighbors' doorbell. His persistence in harassing the women, knowing they were refusing to answer him and even after notice by the police, supports an inference he harbored a malicious intent to put the women in a state of fear for their safety. This is further bolstered by his comments when arrested that he wanted to harm his neighbors. We conclude the stalking convictions are supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.


/s/
HOCH, J.


We concur:


/s/
DUARTE, Acting P. J.


/s/
EARL, J.

7